**STATE of Missouri, Respondent,**

v.

**Billie L. COULTER, Appellant.**

**No. WD 67730.**

Missouri Court of Appeals,
Western District.

June 24, 2008.

Michelle D. Carpenter, St. Joseph, MO, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Andrea K. Spillars, Asst. Attorney General, on brief, Jefferson City, MO, for respondent.

Before PAUL M. SPINDEN, P.J., JAMES M. SMART, JR., and JOSEPH M. ELLIS, JJ.

JAMES M. SMART, JR., Judge.

Billie Coulter appeals her conviction on one count of workers' compensation fraud, for which she was sentenced to seven days in the county jail. The judgment is affirmed.

## Background

In May 2005, Billie Coulter was charged with two counts of workers' compensation fraud for making false statements in order to obtain a benefit, pursuant to section 287.128 RSMo.[1] At a jury trial in October 2006, the evidence, in the light most favorable to the verdict, showed the following.

On January 25, 2004, Ms. Coulter slipped and fell on some ice, landing on her back and leg. This caused pain in her back, her right leg, and her neck. Coulter informed her employer that she was emptying trash as part of her job when she fell. She filed a workers' compensation claim for injuries to her back and legs.

Coulter was evaluated by a doctor who determined that she was not able to work. On January 29, 2004, she began receiving "temporary total disability" benefits. Those benefits equaled two-thirds of her weekly salary, or $180 per week. Coulter was sent to several doctors over the next several months. In March, one of those doctors ordered an MRI scan of Coulter's back. The MRI revealed an annular tear and degenerate disc disease at the 4/5 level, with a mild disc bulge. Such findings may be consistent with significant pain and disability.

Coulter began seeing Dr. Siva Katta in May 2004. Dr. Katta advised her to do home exercises and referred her for physical therapy. Coulter began physical therapy with John Gillaspie of HealthSouth on May 26. Mr. Gillaspie kept a written record of Ms. Coulter's visits and her progress in therapy. Portions of Mr. Gillaspie's records and notes pertaining to Ms. Coulter were read into evidence by State's witness William Byington because Mr. Gillaspie was deceased at the time of trial. This included a progress report, dated June 18, 2004, in which Mr. Gillaspie wrote that Ms. Coulter "cancelled today's appt. stating she was too sore."

On that same day—June 18, 2004—Gregory Seher, an investigator for Missouri Employee Mutual Insurance Company, conducted video surveillance outside Coulter's home from 6:00 a.m. to 4:20 p.m. Ms. Coulter was participating in a garage

---

1. All statutory references are to the Revised Statutes of Missouri, 2000.

sale at her home that day. Mr. Seher observed her throughout the day walking unassisted, bending, and picking up items. Ms. Coulter spent a great deal of time on her feet, and moved freely, without indication of difficulty. Seher videotaped Coulter's activities every time she was visible. She appears on the videotape for two and one half hours. The videotape showed Coulter bending over from the waist on multiple occasions, standing, and walking without assistance. It also showed her picking up and carrying boxes.

On July 9, 2004, Coulter was seen by Dr. James Scowcroft. Dr. Scowcroft testified that Ms. Coulter's reported symptoms could be explained by what he saw on her MRI. He said the level of pain of someone with Ms. Coulter's condition could vary from day to day. Dr. Scowcroft performed an epidural injection during that first visit and again on July 28.

On August 10, 2004, almost seven months after her injury, Missouri Employers Mutual deposed Coulter in connection with her workers' compensation claim. Coulter stated several times in her deposition that she was unable to "stoop" or bend at the waist, and had been unable to do so since her injury in January. Coulter also said she had difficulty walking without assistance since before her first epidural shot on July 9.

Less than a week later, on August 16, Ms. Coulter's benefits were terminated. She received a total of $5,245.71 in temporary total disability payments.

In May 2005, Coulter was charged with two counts of workers' compensation fraud, pursuant to section 287.128.1(8), a class A misdemeanor. Count I alleged that

on or about August 10, 2004, ... defendant knowingly made a false material statement for the purpose of obtaining a benefit, to wit: stating during a deposition that she was unable to bend at the waist and needed assistance to walk.

In count II, she was charged with knowingly making a false material statement (that she was unable to walk on the treadmill) to the physical therapist for the purpose of obtaining a benefit on June 16, 2004. Following a two-day trial, the jury found Coulter guilty of count I. The jury found her not guilty on count II. The court sentenced her on count I to seven days in the Buchanan County Jail. Coulter appeals.

## Point I

Ms. Coulter first argues that the trial court erred in denying her request for a mistrial when the prosecutor, in closing argument, made an impermissible direct reference to her decision not to testify.

### *Standard of Review*

A mistrial is a drastic remedy that should be granted only when prejudice to a defendant can be removed in no other way. *State v. Davis*, 201 S.W.3d 141, 144 (Mo. App.2006). The decision to grant a mistrial lies within the sound discretion of the trial court and is reviewed only for an abuse of discretion. *Id.* We will find an abuse of discretion only where the ruling is "clearly against the logic of the circumstances then before [the court] and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Neff,* 978 S.W.2d 341, 345 (Mo. banc 1998).

### *Analysis*

In the opening portion of her closing argument, the prosecutor stated:

So the fact that she has these physical conditions in her MRI, in her x-rays, according to the doctor, isn't the issue. The question is so what does that mean?

Does that mean that she can't bend? Does that mean that she can't walk? *Well, you know who the only person is that can tell us that is the defendant?* (Emphasis added.) At that point, defense counsel objected on the basis that this was an impermissible reference to Coulter's failure to testify. Counsel approached the bench and requested a mistrial. The court sustained the objection but denied the request for a mistrial. The court informed the jury that the prosecutor's last comment would be stricken from the record and admonished the jury to disregard it. The prosecutor then continued her argument.

■ It is impermissible for a prosecutor to comment, either directly or indirectly, on a defendant's failure to testify. *State v. Barnum,* 14 S.W.3d 587, 592 (Mo. banc 2000). "The Fifth Amendment to the United States Constitution, article I, section 19 of the Missouri Constitution, section 546.270, and Rule 27.05(a)[2] all grant criminal defendants the right not to testify and forbid comments by others on the exercise of that right." *Neff,* 978 S.W.2d at 344 (quoting *State v. Arnold,* 628 S.W.2d 665, 668 (Mo.1982)). The purpose of this rule is to avoid focusing the jury's attention on the defendant's failure to testify. *Id.*

The State correctly points out that in considering such statements, we must view the comment "in the context in which it appears." *Id.* at 345. Following is the context surrounding the prosecutor's comment:

[By the prosecutor]: [W]e know that doctors can't tell us whether or not what she says about how disabled she is is false. They can't tell us whether or not that's false because they assume that what she's telling them is true. They have to assume that. If she comes in and says, "I can't bend," he doesn't cross-examine her and say, "Well, yeah, you can. Sure you can."

In fact, [the doctor] told us that he bases his treatment on what she says to him about the extent of her injury, because again, a lot of people have these kind of conditions.... It's common to have an abnormal MRI. That's what he said. Does she have an abnormal MRI? You betcha. Is it normal to have an abnormal MRI? Yeah.

So the fact that she has these physical conditions in her MRI, in her x-rays, according to the doctor, isn't the issue. The question is so what does that mean? Does that mean that she can't bend? Does that mean that she can't walk? *Well, you know who the only person is that can tell us that is the defendant?* [Emphasis added.]

> [Defense counsel]: Objection, Your Honor. May we approach?
>
> THE COURT: Yes.

At this point, counsel approached the bench, and the following discussion ensued:

> THE COURT: Wait, wait, wait, wait. Yes?
>
> [Defense counsel]: (Indiscernible.)[3]

---

2. Section 546.270 and Rule 27.05(a) both provide that if the accused or defendant

> shall not avail himself ... of his ... right to testify ..., it shall not ... be referred to by any attorney in the case, nor be considered by the court or jury before whom the trial takes place.

3. The transcript was prepared from a sound recording made at the trial. Substantial parts of the record are shown as "indiscernible," particularly bench conferences. Fortunately, the nature of the points on appeal are such that the shortcomings of the record do not require a new trial in this case. However, this case shows the disadvantage of not having a court reporter and illustrates that judges

THE COURT: Okay. [Prosecutor]?

[Prosecutor]: Again, Your Honor (indiscernible) made those statements (indiscernible) and we're looking at the evidence in terms of the words she has said (indiscernible) evidence. And she has said (indiscernible) and I can certainly (indiscernible).

[Defense counsel]: (Indiscernible.)

THE COURT: All right. Well, if it is as [the prosecutor] says that she is trying to reference the fact that the only thing that the care providers can rely upon is what is said by the defendant, that is appropriate—that is an appropriate comment.

I don't think that she intended to—to reference the fact that the defendant has not testified in this case.

And what I'm going to do at this point is strike her last comment from the record, I'm going to tell the jury to disregard it, and I'm going to allow [the prosecutor] to continue with her argument; however, she must continue with her argument in the way in which she has explained to the Court she intended.

Now, did you have any other—

[Defense counsel]: (Indiscernible) objection to what she said (indiscernible).

THE COURT: Did you have any other relief that you requested?

[Defense counsel]: (Indiscernible.)

THE COURT: All right then. Thank you. Let's go back.

[Defense counsel]: (Indiscernible.)

THE COURT: (Indiscernible.) The objection's overruled.

(Proceedings returned to open court.)

THE COURT: Well, let's come back up to the bench for a moment.

and lawyers must beware of the risks of relying on such recording methods. *See State v.*

(At this time, counsel approached the bench, and the following proceedings were had:)

> THE COURT: *Actually, the objection's sustained, but what I'm going to do is strike it from the record, tell the jury to disregard it, and then she's allowed to continue with her argument* as long as it parallels what she said she intended to do. [Emphasis added.]
>
> [Defense counsel]: (Indiscernible) sustain and ask for a mistrial.
>
> THE COURT: You didn't ask for a mistrial that I ever heard.
>
> [Defense counsel]: I would just (indiscernible).
>
> THE COURT: No. I'm sorry then. I didn't hear what you said.
>
> Your—*Your objection is sustained, your request for a mistrial was overruled,* and the Court's going to proceed as I outlined twice before. All right? [Emphasis added.]
>
> [Defense counsel]: (Indiscernible.)
>
> THE COURT: Thank you.

The proceedings returned to open court, and the court addressed the jury, as follows:

> Ladies and gentlemen, *the last comment of the Assistant Attorney General has been stricken from the record and you are to disregard it.* You are to remember that in your deliberations you are to be governed by the evidence as you remember it and the law as given to you by the Court. You're also to remember that arguments of attorneys are not evidence. [Emphasis added.]

The prosecutor then continued her argument in a similar vein, but she did not

*Dorsey,* 156 S.W.3d 791, 800–801 (Mo.App. 2005).

again refer to Coulter's failure to testify. She stated:

> Thank you, Your Honor. And I apologize if I misspoke.
>
> The issue in this case is what she told the doctors and the physical therapists because she was the only one who could tell them how she was feeling. That's all they've had to go on.
>
> And this is about what she said to continue those benefits, about what she told the physical therapists and the lawyers. And this is about whether or not those statements that she made were clearly false.

Coulter says the trial court erred in not granting a mistrial because the prosecutor's statement was an impermissible direct reference to her failure to testify. Even if it was not a "direct" reference, she says, it was an "indirect" reference, which also is prohibited. In either case, Coulter says, the error was not remedied by the court's admonition to the jury nor by a later curative instruction, and, thus, a mistrial should have been granted.

■ A direct reference to a defendant's failure to testify is one that is "straightforward, definite and certain." *State v. Futo*, 990 S.W.2d 7, 14 (Mo.App. 1999). A prosecutor makes a direct reference when he uses words such as "defendant," "accused" and "testify" or their equivalent. *Neff*, 978 S.W.2d at 344. Under certain circumstances, "tell" is considered the equivalent of "testify." *Futo*, 990 S.W.2d at 14. An indirect reference is one that is "reasonably apt to direct the jury's attention to the defendant's failure to testify." *Neff*, 978 S.W.2d at 344. A direct reference, where an objection is made and *overruled*, will "almost invariably" require reversal on appeal. *Id.* An indirect reference, on the other hand, requires reversal only if the prosecutor makes it with a "calculated intent to magnify" the defendant's failure to testify to call it to the jury's attention. *Id.*

The State contends that the challenged comment was not a reference to Coulter's failure to testify, but simply referred to the pre-trial statements she had made to continue receiving benefits. Because she was on trial for making false statements, the State argues, the prosecutor could not avoid discussing what the "defendant" was "telling" others about her injuries. The reference to "us," the State says, referred not to the jury, but to Coulter's treatment providers.

■ We believe that, as a practical matter, the remark had some tendency to draw the jury's attention to the defendant's failure to testify. *See id.; see also Futo*, 990 S.W.2d at 14. Thus, while counsel may have been merely careless, it amounted to an indirect reference on the defendant's failure to testify. However, we do not believe that a mistrial was warranted.

■ A mistrial is not required every time an improper comment—even a direct comment—about a defendant's failure to testify is made. *State v. Tolliver*, 101 S.W.3d 313, 317 (Mo.App.2003) (*citing Neff*, 978 S.W.2d at 347). "[A] prompt instruction ... to the jury to disregard the comment may cure any error in a particular case." *Neff*, 978 S.W.2d at 345. When a trial court takes such action, a mistrial generally is not warranted. *State v. Busey*, 143 S.W.3d 6, 11 (Mo.App.2003) (*citing Neff*, 978 S.W.2d at 345). Here, the court sustained the objection, then immediately instructed the jury to disregard the comment and informed them that the remark would be stricken from the record. We cannot say that it was an abuse of discretion, in evaluating the comment's prejudicial effect, to determine that a mistrial was

not warranted. *See Neff,* 978 S.W.2d at 345; *Tolliver,* 101 S.W.3d at 317.

This is not a case where the prosecutor's remark was so egregious, or the court's admonition so ineffective, that a mistrial was the only adequate remedy. *See Neff,* 978 S.W.2d at 346 (citing cases in which the prosecutor continued to repeatedly refer to the defendant's failure to testify even after admonitions from the trial court). Here, the prosecutor's remark was not repeated, and there is no indication of a "calculated intent to magnify." *See id.* at 344. After sustaining the objection, the court admonished the jury to disregard the comment. We must assume that the jurors followed the court's instruction. *See Tolliver,* 101 S.W.3d at 317. Following the admonition, the prosecutor resumed her argument, and, without drawing attention to the earlier statement, continued her discussion about the false statements Coulter had made to others. She did not again refer to the failure to testify.

Because the reference was in the opening portion of the closing argument, defense counsel had the opportunity in her closing to mitigate any potential prejudice. She stated:

> Instruction No. 9, I just want to draw your attention to. My client didn't take the stand, and that was my—our decision as a strategy. She testified through a deposition already.... You can't hold it against her, no presumption can be made from the point that she didn't take the stand, and I want to make sure that that is clear. That after we've already heard the deposition testimony back and forth, and we've watched this video, we wanted to cut to the chase, and here we are. So absolutely

no presumption can be made from that fact.

Counsel also explained that it is the State's burden to convince the jury of the defendant's guilt beyond a reasonable doubt. Instruction 9, which was given at the defendant's request, stated: "Under the law, a defendant has the right not to testify. No presumption of guilt may be raised and no inference of any kind may be drawn from the fact that the defendant did not testify."[4]

Here, the improper comment was relatively brief and isolated, the court admonished the jury to disregard it, defense counsel addressed the matter in closing, and a curative instruction was given. For these reasons, we conclude that any potential prejudice that may have resulted from the improper statement was sufficiently remedied. The trial court did not abuse its discretion in overruling counsel's motion for a mistrial. Point denied.

### Point III

Ms. Coulter also says the trial court denied her the right to confront the witnesses against her, as guaranteed by the U.S. Constitution and the Missouri Constitution, in allowing the notes and records of Mr. Gillaspie, an unavailable witness whom she did not have the opportunity to cross-examine, to be read into the record by a third party.

#### *Standard of Review*

The Confrontation Clause in the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to ... be confronted with the witnesses against him[.]" U.S. Const. amend. VI. The Missouri Constitution states that "in criminal prosecutions the accused shall

---

4. This tracks the language in Rule 27.05(b), which requires the court to give this instruction, in writing, "[i]f the defendant does not testify, and the defendant so requests, but not otherwise[.]"

have the right to ... meet the witnesses against him face to face[.]" Mo. Const. art. I, sec. 18(a). Whether a defendant's rights under the Confrontation Clause were violated is a question of law that is reviewed *de novo*. *State v. March*, 216 S.W.3d 663, 664–65 (Mo. banc 2007).

### *Analysis*

■ Prior to trial, defense counsel sought a motion in limine to exclude Mr. Gillaspie's notes and records on the basis that they were hearsay evidence that was testimonial in nature, as described in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Counsel claimed that the evidence was "testimonial" because Mr. Gillaspie had prepared the records and notes in preparation of litigation.[5] The court denied the motion.

At trial, over defendant's objection, William Byington, an employee of the insurance company, was allowed to read excerpts from Mr. Gillaspie's treatment notes (exhibits 3A and 3B) to the jury. Exhibit 3A, a treatment note from June 18, 2006, stated:

> [Patient] has [complaints of] increased pain since her trigger pt. injection and states she is unable to tolerate any exercises. I attempted her on some walking on treadmill, but she stated she was unable to continue after about a minute. Waddel signs appear positive. [Patient] cancelled today's appt. stating she was too sore.

In a treatment note dated June 16, 2006, (exhibit 3B) Mr. Gillaspie had written:

Observations: After modalities, I tried to have [patient] walk on treadmill but after less than a minutes [sic] she stated it was hurting her back too bad to continue. Tolerance: Very poor tolerance to any attempted exercise, i.e., [patient] was unable to walk on treadmill but walked equivalent of nearly a block to her car.

In *Crawford v. Washington*, the U.S. Supreme Court held that when out-of-court statements are "testimonial" in nature, they are inadmissible under the Confrontation Clause, unless (1) the witness is unavailable at the time of trial, and (2) the defendant had a prior opportunity to cross-examine him. 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The crucial determination under *Crawford* is whether the out-of-court statement is "testimonial." *Id.* at 51, 124 S.Ct. 1354. In examining what it means for a "witness" to "bear testimony" against the accused, the Court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* While declining to precisely define "testimonial," *Crawford* cited various "formulations of this core class of 'testimonial' statements[.]" *Id.* Among those "formulations" are "pretrial statements that declarants would reasonably expect to be used prosecutorially[.]" *Id.*

In *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Court held that a statement made in response to police interrogation was testimonial if its "primary purpose" was to "prove

---

5. Defense counsel referred to something in Mr. Gillaspie's notes that evidently was redacted before it was admitted into evidence and, thus, is not available to this court. In her brief, Coulter recites the following, which she says appeared in Mr. Gillaspie's June 16, 2004, treatment note: "Have had ongoing discussions c [with] CM [presumably, case manager] and Physician—Pt. [patient] currently under surveillance by ins. co." This, we presume, is what defense counsel was relying upon in her argument on the motion in limine.

past events potentially relevant to later criminal prosecution." *March,* 216 S.W.3d at 666 (quoting *Davis,* 547 U.S. at 823, 126 S.Ct. 2266). Following *Davis,* the Missouri Supreme Court in *March,* focused on the *purpose* of the out-of-court statement. *Id.* There, the Court held that laboratory reports prepared at the request of law enforcement for the purpose of prosecution were "testimonial" under *Crawford. Id.* The Court focused on the fact that the report was prepared solely for prosecution to prove an element of the crime charged. *Id.*

Here, the primary purpose of Mr. Gillaspie's notes and records was to record information about Coulter's treatment, *e.g.,* her appointment times, the treatment rendered, and her progress in therapy. The records contained information that directly related to her medical condition. They were not made to government agents or as part of a criminal prosecution, as in *March.* Even if the redacted portion of the notes indicated an awareness that the insurer had doubts about the validity of the claim, and that the continued provision of benefits might be denied by the insurer, or that civil litigation could occur, as Coulter contends, we lack precedent for the notion that such notes should be regarded as "testimonial" for *Crawford* purposes. We are not aware of any cases extending the concept of "testimonial" communications to recorded statements which relate to a party's contract or statutory rights. There are very few reported prosecutions for workers' compensation fraud, so we are not sure that Mr. Gillaspie would have thought of his notes as amounting to a "testimonial" communication. Because the main purpose of the notes was to document treatment and therapy issues, and

because there was no showing here that Mr. Gillaspie had notice of the likelihood of a criminal prosecution, we are not persuaded that the terse notes should be regarded as a "testimonial" statement such as the statement in *Crawford.*

One thing we are persuaded of, however, is that we do not need to decide the *Crawford* issue in this case. That is because we know from the verdict that the jury chose not to rely on the physical therapy records. The jury, in its discretion, decided that the records should not be relied upon in deciding count II. We know that because count II was based exclusively on Gillaspie's comment in the treatment notes that the accused walked to her car, parked a block away. An acquittal on count II was entirely consistent with a lack of confidence in the accuracy of the physical therapy records. Count I, in contrast, was not affected by the jury's view of the reliability of the physical therapy records. The conviction of count I was based on the evidence of the videotape and Coulter's deposition testimony under oath, rather than on the physical therapy records. For these reasons, we deny the argument based on *Crawford.*

Coulter also says the records violated the "competent evidence rule," section 490.680. Section 490.680 allows business records, such as medical records, to be admitted as "competent evidence" if, among other things,[6] the custodian testifies as to their identity and method of preparation. Coulter does not clearly explain how the records "violate" this rule. She seems to be saying that because Mr. Byington did not prepare the records and was not their custodian, he should not have been permitted to read from them. Section 490.692 allows these types of records to be admit-

---

**6.** Additionally, the records must have been made in the regular course of business at or near the time of the act and the court must determine that the methods and time of preparation justify admission. Section 490.680.

ted without testimony if they are accompanied by an affidavit from the custodian stating that they satisfy the requirements that are found in section 490.680.[7] The records were timely submitted, along with an affidavit from their custodian, and, thus, were properly admitted under 490.692. Once the records were properly admitted, there was no prohibition against Mr. Byington reading them to the jury. *See, e.g., State v. Goodson,* 943 S.W.2d 239, 240 (Mo.App.1997). Again, in any event, we cannot say that the physical therapy records prejudiced the accused.

For the same reason, any concern that Mr. Byington's reading of exhibits 3A and 3B was less than articulate was a question for the jury, who saw the exhibits themselves and found them less than compelling. Point denied.

### Points II & IV

Because of the acquittal on count II, the appellant challenges only her conviction on count I for testifying falsely at her deposition. Ms. Coulter contends that the evidence at trial was insufficient to support her conviction, in that the June 18 videotape was "too remote" in time to prove that on August 10 she knowingly made a false material statement for the purpose of obtaining a benefit. Coulter also contends, based on that same argument, that the videotape was inadmissible.

### *Standard of Review*

In reviewing the sufficiency of the evidence, our role is limited to determining whether the State presented sufficient evidence from which a reasonable juror could have found the defendant guilty beyond a reasonable doubt. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the State and disregard all evidence and inferences to the contrary. *Id.*

### *Analysis*

■■■ The Due Process Clause requires the State to prove every element of the crime charged beyond a reasonable doubt. *In Re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Coulter was charged with workers' compensation fraud in violation of section 287.128.1(8). The elements of that crime are: "(1) knowingly, (2) making or causing to be made, (3) any false or fraudulent, (4) material statement or material representation, (5) for the purpose of obtaining or denying any benefit." *State v. Barnes,* 942 S.W.2d 362, 368 (Mo. banc 1997).

Specifically, count I alleged that

on or about August 10, 2004, . . . [Coulter] knowingly made a false material statement for the purpose of obtaining a benefit, to wit: stating during a deposition that she was unable to bend at the waist and needed assistance to walk.

Coulter contends that the evidence was insufficient to support her conviction on this charge, because the June 18 videotape—which the State relied on to prove that her deposition statements were false—was "too remote" in time to be relevant or related to her statements in the deposition. She says the deposition questions focused on what her abilities were on August 10, not what they were prior to the deposition or at the time the videotape was made. The State says this argument ignores Coulter's statements in the deposition that she has been unable to bend

---

7. Subsection 2 of that statute requires the party offering the records to serve all other parties with copies of the records and the affidavit at least seven days prior to trial. Coulter makes no claim this was not done.

*since her injury* on January 25. We agree. In her deposition she testified:

Q. So you're not able to do it at all, to stoop over—if you were to stand, you couldn't take care of your flowers; is that right?

A. I can't stand and take of my flowers, no.

Q. And you can't bend over, is what I mean. That's the problem?

A. Yes.

Q. And *has it been like that ever since the injury?*

A. *Yes.*

. . . .

Q. Do you take care of [the cats'] litter box; do you change their litter box?

A. I haven't been able to. I've had to have somebody do it for me.

Q. And *how long has that been going on?*

A. Ever since—

Q. *Since you got hurt?*

A. *Yes.*

Q. . . . . Why has somebody else had to do that for you?

A. The stooping over to do it.

(Emphasis added.) Toward the end of the deposition, Coulter again stated that she had been unable to bend at the waist since the date of the accident:

A. Let me ask you about the stooping over, like to stoop over to do that. If you were to try to do that—and *I'm talking about ever since the accident happened.* If you were to try to do that, would you feel an increase in your back?

A. Yes.

Q. Would you feel an increase in your leg pain?

A. Yes.

Q. Would you have trouble getting back up to a standing position?

A. Yes.

Q. So it hurts so bad that you just don't do it; is that correct?

A. Yes.

(Emphasis added.) Coulter also said she had had difficulty walking without assistance since before her first epidural shot on July 9, 2004. She stated that she used a cane and sometimes relied upon her sister for assistance with walking. She said that during physical therapy she had to stop walking on the treadmill because of the pain. She stated that she had had constant back and leg pain since the accident and that her medication only reduced the pain, but did not allow her to bend, stand longer, or walk further. Coulter said that since her injury she has needed help fixing meals and that she spends her days watching TV or reading.

Portions of the videotape were shown to the jury. The tape showed Coulter on June 18 (the day she reported she could not do physical therapy), casually bending over on several occasions, then standing back up without apparent hesitation, walking without assistance, and picking up boxes, all without any appearance of difficulty. On one occasion she appeared to bend over at the waist to pet a dog. A couple of other times, while talking casually on the phone, she bent over at the waist as though pulling some weeds from her flower garden. That June 18 videotape was relevant and direct evidence to show that her August 10 deposition statements that she had been unable to do such things *since her injury* in January were false. The jury could infer from those false statements, and the fact that she continued to receive benefits, that she knowingly made the false statements for the purpose of obtaining those benefits. *See, e.g., State v. Wyman,* 945 S.W.2d 74, 76–77 (Mo.App. 1997) (an intent to defraud can be inferred

from the evidence and from the statements themselves). The videotape and the deposition together constituted sufficient evidence for a reasonable juror to find Coulter guilty of workers' compensation fraud beyond a reasonable doubt. Point denied.

Coulter also argues, in a related point, that the videotape should not have been admitted, because it was not "authenticated." One of the requirements for the videotape to be admissible as a business record is that it must have been made in the regular course of business, *at or near the time* of the act, condition, or event. Section 490.680. According to Ms. Coulter, the videotape should not have been admitted, because it did not meet this criterion.

Ms. Coulter ignores the fact the tape was presented and sponsored by Gregory Seher, the person who personally made the recording and was able to testify as to its authenticity. In any event, we find no record that the authenticity of the tape was challenged at trial. Ms. Coulter again says the June 18 videotape was "too remote" from the August 10 deposition, and that therefore it was not relevant. We disagree. The court did not err in admitting this evidence. Point denied.

## Conclusion

For the foregoing reasons, the judgment is affirmed.

SPINDEN and ELLIS, JJ., concur.