**STATE of Missouri, Respondent,**

v.

**Marshall A. TILLMAN, Appellant.**

No. WD 69472.

Missouri Court of Appeals,
Western District.

July 7, 2009.

Ruth B. Sanders, Kansas City, MO, for appellant.

Shaun J. Mackelprang, Jefferson City, MO, for respondent.

Before THOMAS H. NEWTON, C.J., P.J., HAROLD L. LOWENSTEIN, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

After a jury trial on charges of murder in the second degree, rape, and forcible sodomy, Marshall Tillman appeals his convictions. His points on appeal pertain to the admission of evidence and testimony and to the wording of the verdict director. The judgment is affirmed.

## Facts

The deceased victim was found dead in her Kansas City home on August 26, 1987. She was eighty-eight years old and lived alone at that time. There was no sign of forced entry at her home, and nothing was disturbed inside the house except for one overturned end table. The victim's body was lying on the living room floor; her dentures were lying next to her body. There was blood spattered in various places in the house. The victim's jaw was broken in two places, there were blunt trauma injuries to her head, and her neck was injured in a manner consistent with manual strangulation. There were no injuries to her body below her neck, though it was determined that semen was present in her vagina and anal cavity. Her body was clad in a housedress, which was bunched up around her upper torso with her bra and garter. A pillowcase partially covered her face and a pair of panties was found next to her.

Investigators recovered pubic hairs from the carpet and intact sperm from the victim's body. These specimens were preserved for later analysis, and the case remained unsolved for over fifteen years. In 2003 and 2004, the Kansas City Crime Lab tested the hairs and sperm for DNA. The lab developed a profile from the sperm, which matched the profile of the hairs. The profile was matched in the DNA database to Marshall Tillman. The lab tested a buccal swab taken from Tillman, and his DNA profile matched the profile of the contributor of the sperm and hairs.

Tillman and his wife had been the victim's neighbors. He was separated from his wife at the time of the victim's death, living in another neighborhood. He told police that he went to his former home (next door to the victim's) every day to get the mail. Tillman was subsequently

charged with first-degree murder, rape, and forcible sodomy.

The autopsy of the victim was conducted by Dr. John Overman, who was deceased at the time of trial. Before trial, the defense moved to exclude the testimony of Dr. Mary Dudley, the current medical examiner, regarding the autopsy report and findings of the deceased former medical examiner. The State agreed that Dr. Overman's report itself would not be admissible. It argued, though, that Dr. Dudley could review Dr. Overman's report, autopsy photographs, and the crime scene photographs and testify to any conclusions she independently reached from those sources. The court ruled that Dr. Dudley could testify as to her own opinion formed based upon the autopsy photographs and other materials.

Dr. Dudley testified that the victim was struck in the head at least twice. She stated that the victim had also been strangled. Dr. Dudley concluded that the victim died of asphyxia by strangulation, a homicidal act.

Tillman did not testify at trial. The defense called Dr. Thomas Young, a former medical examiner and a pathologist in private practice, to testify as to his interpretation of the autopsy results. Dr. Young testified that he believed the victim likely bled to death because of blunt force trauma. Dr. Young could not determine whether the manner of death was homicide or accident.

Tillman was convicted of rape, forcible sodomy, and the lesser-included offense of murder in the second degree. The jury recommended three life sentences, and the court sentenced him accordingly to three consecutive life sentences. Tillman appeals.

## Point I

■ In his first point, Tillman claims the trial court erred in allowing the State to elicit testimony from Dr. Dudley regarding Dr. Overman's conclusions and opinions in the autopsy report. He argues that the admission violated his rights to cross-examine and confront the witnesses against him, to a fair trial, and to due process of law. Tillman states that the autopsy report and Dr. Overman's conclusions are hearsay, and the defense did not have a prior opportunity to cross-examine Dr. Overman. He claims he was prejudiced because the defense contested the cause of death, and because Dr. Dudley testified to Dr. Overman's opinions regarding the nature of the injuries and the cause of death instead of testifying to the facts and data she relied upon in forming her opinions. Tillman also maintains that the jury learned that Dr. Overman corroborated Dr. Dudley's conclusions regarding the nature of the injuries and the cause of death.

"We review a trial court's decision to admit evidence for an abuse of discretion." *State v. Nabors*, 267 S.W.3d 789, 793 (Mo. App.2008). "This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion." *Id.* "We review trial court decisions regarding the admissibility of evidence for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Id.* However, whether a criminal defendant's constitutional rights were violated is a question of law that an appellate court reviews *de novo. Id.*

■ "It has long been recognized that opinions of a physician may be drawn from facts which he has observed in the course of his examination and evidence which he has heard and read assuming that it is in

the record and assuming it is true." *State v. Brooks*, 551 S.W.2d 634, 657 (Mo.App. 1977). "An expert witness is entitled to rely on hearsay evidence to support his opinion so long as that evidence is of the type reasonably relied upon by other experts in that field; such evidence need not be independently admissible." *State v. Hendrix*, 883 S.W.2d 935, 940 (Mo.App. 1994). A medical examiner is permitted to testify as an independently qualified expert who bases his or her opinion on the factual information in an autopsy report prepared by a different doctor. *See State v. Owsley*, 959 S.W.2d 789, 795–96 (Mo. banc 1997) (holding that such testimony is not hearsay because the testifying doctor did not testify about the autopsy-performing doctor's opinion).

In *State v. Haslett*, 283 S.W.3d 769 (Mo. App. S.D.2009), a doctor reviewed the autopsy documentation and investigative documentation prepared by others and rendered his own conclusions and opinions as to what caused a child's death. *Id.* at 776–77. He testified that he was not speaking on behalf of the doctor who performed the autopsy but, instead, offered a second opinion, which was common in his area of expertise. *Id.* The court concluded that the testimony was not hearsay because the doctor testified as to his own opinions and did not state the other doctor's opinions. *Id.* at 777–78. The court further noted that the autopsy report was not introduced into evidence. *Id.* "Generally, an expert may rely on hearsay evidence as support for opinions, as long as that evidence is of a type reasonably relied upon by other experts in the field; such evidence need not be independently admissible." *State v. Brown*, 998 S.W.2d 531, 549 (Mo. banc 1999); *see also State v. Candela*, 929 S.W.2d 852, 866 (Mo.App.1996) (holding that "[m]edical records and police reports, such as were purportedly relied on ... here, can be relied upon by expert witnesses in giving their opinions"). The *Haslett* court found no error.

Dr. Dudley testified that she conducted an independent analysis of the victim's autopsy, relying on the forms and documents in the case file including the autopsy report, photographs, investigation reports, lab reports, and death certificate. She stated that these types of materials are reasonably relied upon by experts in the field of forensic pathology. Dr. Dudley also testified that autopsy reports are made in the ordinary course of business and are prepared at or near the time of the autopsy. Dr. Dudley testified that her conclusions as to how the injuries occurred were based on photographs and descriptions of the injuries. From her independent analysis, Dr. Dudley concluded that the cause of death was asphyxia by strangulation and that the manner of death was homicide. On cross examination, Dr. Dudley acknowledged that Dr. Overman conducted the exam more than twenty years prior. She stated that she was relying on the file, primarily the autopsy report and photographs, to form her conclusions. Dr. Dudley's testimony regarding her independent conclusions and opinions was not error.

Tillman further complains that Dr. Dudley testified as to Dr. Overman's opinions and conclusions. He refers to the following:

> **Prosecutor:** All of these injuries which you've described to the internal anatomy of the neck, what are they consistent with?
>
> **Dr. Dudley:** They are all consistent and actually listed as the first diagnosis on Dr. Overman's report of strangulation. . . .
>
> . . . .
>
> **Prosecutor:** Now, based on your independent analysis of the autopsy report,

the autopsy photographs and the crime scene photographs, have you formed an opinion as to the cause of death?

**Dr. Dudley:** Yes.

**Prosecutor:** And what is that?

**Dr. Dudley:** I agree with Dr. Overman, that this is a—that [the victim] died of asphyxia by strangulation.

Before trial, the defense had moved to exclude Dr. Dudley's testimony regarding Dr. Overman's autopsy report and findings. The State agreed that Dr. Overman's report itself would not be admissible as a separate document, and further agreed that Dr. Overman's *opinions* were not admissible in any form. The State argued, though, that Dr. Dudley could review Dr. Overman's report, autopsy photographs, and the crime scene photographs, and testify to any conclusions she independently reached from those sources. The court ruled that Dr. Dudley could testify as to her *own* opinion formed based upon the autopsy photographs and other materials. Thus, there was an understanding between court and counsel that Dr. Overman's conclusions were not admissible. The defense continued to maintain, however, that no part of the autopsy was admissible, whether physical data or opinions drawn therefrom.

At trial, prior to Dr. Dudley's testimony, defense counsel requested that the record show a continuing objection by the defense to any testimony by Dr. Dudley. The defense objection was that *any* testimony by Dr. Dudley related to the autopsy would constitute impermissible hearsay. The court granted a continuing objection to any testimony by Dr. Dudley on grounds of hearsay, and the court also granted a separate continuing objection to the defense on the ground that any reference to the records of the autopsy violated

the Confrontation Clause. The court, stated, however, that "any other objection within the questioning, that you'll still have to make those; but for the general proposition that it violates [the Confrontation clause under *Crawford v. Washington*[1]] and [the rule against] hearsay, you'll have that continuing objection."

■ During Dr. Dudley's testimony, defense counsel, despite the court having granted a continuing objection, objected that Dr. Dudley was reading the physical description of the marks on the victim's body from Dr. Overman's report. The court overruled the objection, affirming its prior ruling that Dr. Dudley's independent evaluation and opinion could properly be based in part on the description of physical marks observed on the victim's body. Then, when Dr. Dudley spontaneously referred to Dr. Overman's *conclusions* (which court and counsel had agreed was not permissible), counsel made no objection.

■ A continuing objection "signifies the mutual understanding between defense counsel, opposing counsel and the trial court that defense counsel intends to keep his objection alive throughout the trial." *State v. McWhorter,* 240 S.W.3d 761, 763–64 (Mo.App.2007). Tillman's continuing objection to *any* use of the autopsy was preserved throughout the trial, but on appeal it is abandoned except to the extent that Tillman objects to the statements of Dr. Dudley concerning Dr. Overman's conclusions.

The court had properly ruled that Dr. Dudley could testify as to her *own* opinion formed based upon the *data* recorded in the report and the photographs; but the court had also agreed with Tillman to the extent of concluding that Dr. Dudley was not entitled to testify as to *Dr. Overman's*

1. *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

opinions and conclusions. Thus, the court and Tillman were in agreement insofar as the court ruled Dr. Overman's opinions and conclusions were not admissible.

The issue here, then, is related to the fact that Dr. Dudley spontaneously went beyond the scope of what the court had allowed, and volunteered Dr. Overman's *conclusions*. The court had agreed with Tillman that such statements were not admissible, but the witness had not complied with the anticipated script. When this occurred, Tillman did not call the matter to the court's attention or seek relief from the court. Did Tillman have a possible strategic reason for not calling it to the court's attention? The accusation that the trial court should have taken action *sua sponte* rings somewhat hollow when we note that counsel heard the volunteered testimony and did not call the matter to the court's attention at trial. Did counsel want merely an instruction to disregard? Or did counsel feel the only reasonable corrective action would be a mistrial? Or did counsel, at the time, believe the testimony was harmless?

Court and counsel had all agreed that Dr. Overman's *opinions* were not admissible; the dispute was about other matters that are not at issue before us. When there is an understanding between court and counsel that something is not to be permitted, such an understanding means that the court is prepared to grant appropriate relief as requested. But it does not require the court to take over the role of counsel. This court cannot convict the trial judge of error where a witness spontaneously blurts out impermissible testimony and the defense fails to ask for a remedy.

This principle is recognized in the cases. In *State v. Jackson,* 690 S.W.2d 491 (Mo. App.1985), for instance, defense counsel filed a pre-trial motion in limine to prevent the prosecutor from inquiring into an incident that occurred at a laundromat on the afternoon of the defendant's arrest. *Id.* at 492. Although the trial court declined to rule in advance that the laundromat incident was inadmissible, the prosecution agreed not to inquire into the incident at trial. *Id.* At trial, when the prosecutor asked two witnesses to describe the defendant's condition on the afternoon of his arrest, the witnesses spontaneously mentioned the events that occurred at the laundromat. *Id.* The defendant did not make a timely objection or call the court's attention to the spontaneous testimony. *Id.* The reviewing court found that defendant's complaint was not preserved. *Id.* at 494.

Similarly, in *State v. Kuhrts,* 571 S.W.2d 709 (Mo.App.1978), the trial court ordered a trooper to reveal the name of a confidential informant. *Id.* at 716. In disclosing the informant's name, the trooper indicated he was "worried about [the informant's] personal safety." *Id.* The defendant's counsel did not request that a mistrial be declared or request any other relief. *Id.* The reviewing court noted that the reference to the informant's personal safety by the trooper was a voluntary statement in response to the remark made by the court. *Id.* There was no attempt by the court or the prosecution to connect the defendant with the danger to the personal safety of the informant. *Id.* The reviewing court held that the trial court did not err in failing to declare a mistrial where the defendant made no request for corrective relief. *Id.* at 717.

Here, as in *Jackson* and *Kuhrts,* the objectionable statements were voluntarily made by the witness, and the defense failed to seek a remedy. *See also Coats v. Hickman,* 11 S.W.3d 798, 805–06 (Mo.App. 1999).

The cases Tillman relies upon are distinguishable. In *State v. Bell*, 274 S.W.3d 592 (Mo.App.2009), the prosecutor asked the testifying medical examiner whether her opinion comported with the prior medical examiner's opinion. Thus, the objectionable testimony was deliberately elicited. In *State v. March*, 216 S.W.3d 663 (Mo. banc 2007), and *State v. Davidson*, 242 S.W.3d 409, 417 (Mo.App.2007), the report at issue was intentionally admitted into evidence without the writer's testimony. Here, in contrast, the court agreed with Tillman that the opinions of Dr. Overman were not admissible. *See State v. White*, 14 S.W.3d 121, 127 (Mo.App.2000) (distinguishing cases relied upon by the defendant because in those cases the prosecutor deliberately elicited the improper testimony and used it during closing arguments to imply the defendant's guilt).

The point is denied.

## Point II

In his second point, Tillman claims the trial court plainly erred in submitting instruction number eight (the verdict director for the lesser-included offense of murder in the second degree) to the jury. He argues that the submission violated his rights to notice of the charges against him, due process of law, and a fair trial. Tillman maintains that the verdict director varied materially and prejudicially from the act charged in the information, because the information alleged that he "knowingly caused the death of [the victim] by strangling her" and the verdict director allowed the jury to find that her death was caused "through blunt force trauma." He states that he was prejudiced because the verdict director excused the State from its burden of proof in a contested element of the crime, because Tillman had no notice that he would have to defend against the accusation that the offense was committed by blunt force trauma. Tillman also claims the variance neutralized his defense that the State failed to prove that the victim died of strangulation.

▮ Tillman concedes that he failed to properly preserve this alleged error. He requests plain error review. "The plain error rule should be used sparingly and does not justify a review of every alleged trial error that has not been properly preserved for appellate review." *State v. Darden*, 263 S.W.3d 760, 762 (Mo. App.2008). "In determining whether to exercise its discretion under plain error review, the appellate court looks to determine whether on the face of the appellant's claim substantial grounds exist for believing that the trial court committed a 'plain' error, which resulted in manifest injustice or a miscarriage of justice." *Id.* "Plain error for purposes of Rule 30.20 is error that is evident, obvious, and clear." *Id.*

"Plain error review involves two steps." *Id.* "First, the court must determine whether the trial court committed an evident, obvious and clear error, which affected the substantial rights of the appellant." *Id.* at 762–63. "[I]f obvious and clear error is found in the first step of the review, the second step of plain error review requires the court to determine whether manifest injustice or a miscarriage of justice resulted therefrom." *Id.* at 763. "[U]nder Missouri law, plain error can serve as the basis for granting a new trial on direct appeal only if the error was outcome determinative [.]" *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006). "Manifest injustice is determined by the facts and circumstances of the case, and the defendant bears the burden of establishing manifest injustice." *Id.*

▮ "[I]nstructional error seldom constitutes plain error, which requires a defendant to demonstrate more than mere prejudice." *Darden*, 263 S.W.3d at 763.

"For instructional error to rise to the level of plain error, the trial court must have so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict." *Id.* "In determining whether the misdirection likely affected the jury's verdict, an appellate court will be more inclined to reverse in cases where the erroneous instruction did not merely allow a wrong word or some other ambiguity to exist, but excused the State from its burden of proof on a contested element of the crime." *Id.*

 A person cannot be "charged with one offense, or with one form of an offense, and convicted of another." *State v. Lee,* 841 S.W.2d 648, 650 (Mo. banc 1992). A variance between the information and instruction can be fatal when it prevents the defendant from receiving adequate notice of the crime with which he is charged. *See id.* "[W]hen a crime may be committed by any of several methods, ... the method or methods submitted in the verdict directing instruction must be among those alleged in the information." *Id.* "The reason for the rule ... is to foster and protect the primary purpose of the information, that of providing notice to the accused so that the accused may prepare an adequate defense against the charges brought." *Id.*

 "A variance alone is not conclusive to the question of whether there is reversible error." *Id.* "A variance is not fatal, and will not require reversal, unless it submits 'a new and distinct offense from that with which defendant was charged.'" *State v. Glass,* 136 S.W.3d 496, 520 (Mo. banc 2004). "A variance must be material, and defendant must be prejudiced, to war-

rant reversal." *Id.* "Variances are material when they affect whether the accused received adequate notice; variances are prejudicial when they affect the defendant's ability to defend against the charges." *Id.* "[U]nless the defendant can be said to have been prejudiced in that he would have been better able to defend had the information contained the [same] phrase ..., he should not be entitled to relief on account of the variance." *Lee,* 841 S.W.2d at 650. "A variance is prejudicial only if it affects the [defendant's] ability adequately to defend against the charges presented in the information and given to the jury in the instructions." *Id.*

The closed indictment stated:

The Grand Jurors of the County of Jackson, State of Missouri charge the defendant, Marshall A. Tillman, in violation of Section 565.020 RSMo, committed the Class A Felony of Murder in the First Degree, punishable by conviction under Section 565.020 RSMo, in that between and including August 25, 1987 and August 26, 1987, in the County of Jackson, State of Missouri, the defendant, after deliberation, knowingly caused the death of [the victim] *by strangling her.*

(Emphasis added.) The defense presented evidence at trial that the victim's death was caused by blunt force trauma and not strangulation. The verdict director for murder in the second degree[2] stated in relevant part:

As to Count I, if you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree.

---

2. The State submitted the verdict directors for first-degree murder and the lesser-included offense of murder in the second degree. As correctly noted by Tillman, this court is not concerned with any alleged error in the verdict director for first-degree murder because Tillman was acquitted on that charge.

First, that on or between August 25, and August 26, 1987, in the County of Jackson, State of Missouri, the defendant caused the death of [the victim] *by strangling her or through blunt force trauma,* and

Second, that defendant knew or was aware that his conduct was causing or was practically certain to cause the death of [the victim],

Then you will find the defendant guilty under Count I of murder in the second degree.

(Emphasis added.)

Tillman argues that the addition of "or through blunt force trauma" excused the State from proving what it charged: that he strangled the victim. He claims that he was not given adequate notice of the charges against him. He also states that the State used a surprise tactic and changed the charge after evidence of blunt force trauma was presented.

The verdict director did not submit a "new and distinct offense" from the offense alleged in the indictment. *Glass,* 136 S.W.3d at 520. Section 565.021 provides in relevant part:

1. A person commits the crime of murder in the second degree if he:

(1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person[.]

Both the indictment and the verdict director alleged or required a finding that Tillman knowingly caused the victim's death. *See State v. Jones,* 930 S.W.2d 453, 455 (Mo.App.1996) (holding that variance between an information that stated defendant committed robbery "in concert with others" and a verdict director which omitted any reference to other actors did not submit a new and distinct offense because

both the information and the instruction referred to robbery in the first degree). The variance was not a material change in the charge. It was merely a change in the instrumentation. It was not error. *See, e.g., Darden,* 263 S.W.3d at 764.

The rule that when a crime may be committed by any of several methods, the method submitted in the verdict directing instruction must be among those alleged in the information, *Lee,* 841 S.W.2d at 650, does not help Tillman here. That statement of law applies to situations where a statute provides that a crime may be committed in multiple ways. *See, e.g., State v. Armstrong,* 863 S.W.2d 374, 376–77 (Mo. App.1993) (observing that, pursuant to statute, "the crime of trespass in the first degree can be violated in one of two ways: (1) when the defendant knowingly enters a building unlawfully; or (2) when the defendant knowingly remains unlawfully in a building."); *State v. King,* 747 S.W.2d 264, 275 (Mo.App.1988) (referencing the rule with respect to a statute prohibiting an offense that may be committed in different ways); *State v. White,* 431 S.W.2d 182, 185 (Mo.1968) (noting that the stealing statute prohibits intentional stealing of another's property "either without his consent or by means of deceit" and, thus, embraces two methods "which should be differentiated in pleading and proof"). This is not such a situation.

Tillman attempts to distinguish *State v. Darden,* 263 S.W.3d 760 (Mo.App.2008), by stating that Darden was on notice that he would have to defend against the allegation he beat, as opposed to strangled, the victim, and that Darden's ability to defend against the charges against him was not impacted by the variance. Tillman states that he was not on notice that he would have to defend against a charge of inflicting blunt force trauma and that his defense was solely premised on disproving

that the victim died from strangulation. His arguments are not convincing.

Tillman is the one who introduced evidence of blunt force trauma. It appears he was attempting to prove that the blunt force trauma was inflicted through an accidental fall as opposed to through a homicidal act. His expert opined that the victim died as the result of blunt force trauma but could not determine whether the manner of death was homicide or accident. Thus, Tillman was not taken by surprise by a verdict director allowing the jury to find that the victim died of blunt force trauma.

Secondly, and more importantly, the cause of the victim's death is not an element of murder in the second degree. The State had to prove, and Tillman had to defend against, the allegation that Tillman: (1) knowingly; (2) caused; (3) the victim's death. Tillman could not have avoided conviction by arguing that he intentionally killed the victim through infliction of blunt force trauma as opposed to strangulation. Because Tillman's defense was that the victim died from an accidental fall, the variance in the method through which it was alleged he intentionally killed the victim, if error at all, does not rise to the level of plain error.

The point is denied.

## Point III

In his third point, Tillman claims the trial court erred in admitting State's exhibits 39 through 45. He argues that the State failed to lay a foundation for the admission of these photographs and that their admission violated his rights to a fair trial and due process of law. Tillman maintains that no witness testified that the

photographs fairly and accurately depicted the autopsy of the victim's body. He also states that he was prejudiced because the State relied on the photographs to establish the nature of the injuries and the cause of death.

"A trial court is vested with broad discretion in the admission of photographs." *State v. Cowles*, 203 S.W.3d 303, 312 (Mo.App.2006). "The decision of the trial court will not be overturned absent an abuse of discretion." *Id.* "The admission of photographs is a discretionary act and will be found erroneous only if the ruling resulted in fundamental prejudice and an abuse of discretion." *Id.* "[A] conviction will be reversed due to admission of improper evidence only if the defendant proves prejudice by showing a reasonable probability that in the absence of such evidence the verdict would have been different." *State v. Thompson*, 112 S.W.3d 57, 63 (Mo.App.2003).

"A proper foundation must be laid by the proponent of a photograph when attempting to introduce the photograph into evidence." *Cowles*, 203 S.W.3d at 312. "As such, 'the party offering the [photograph] must show that it is an accurate representation of what it purports to show and foundation may be established through the testimony of any witness who is familiar with the subject matter of the [photograph] and competent to testify from personal observation.'" *Id.* "The determination of whether a proper foundation is established is within the discretion of the trial court." *Id.*

At trial, the State sought to admit exhibits 39 through 45, which were photographs of the autopsy, as non-testimonial[3] business records, and the court

3. In *State v. Davidson*, 242 S.W.3d 409, 416–17 (Mo.App.2007), the court held that the business record exception does not overcome

the Confrontation Clause right with respect to testimonial evidence. No party asserts, and this court does not find, however, that photo-

admitted them on this basis. Business records, if properly identified, are admissible. *State v. Weaver,* 912 S.W.2d 499, 517 (Mo. banc 1995). Section 490.670 provides that "[t]he term **business** shall include every kind of business, profession, occupation, calling or operation of institutions, whether carried on for profit or not." Section 490.680 states:

> A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

"To establish the foundation for the admission of a business record, the testifying witness need only be a custodian of the record, or other qualified witness, and must testify to the record's 'identity, mode of preparation, and that it was made in the regular course of business at or near the time of the act, condition or event.'" *State v. Newlon,* 216 S.W.3d 180, 186 (Mo.App. 2007). "[T]he 'bottom line' regarding the admissibility of the business records is the discretionary determination by the trial court of their trustworthiness." *Alberswerth v. Alberswerth,* 184 S.W.3d 81, 101 (Mo.App.2006). "A trial court is afforded broad discretion in determining whether the parties complied with section 490.680." *Id.* at 101–02.

Tillman argues on appeal that a photograph cannot be a business record because, according to Black's Law Dictionary, a "record" is a "written account" of something. Dictionary definitions notwithstanding, a photograph is admissible as a business record. Section 490.680 pertains to a "record of an act, condition or event." A photograph, like a videotape or audio recording, records an act, condition, or event. *See, e.g., State v. Coulter,* 255 S.W.3d 552, 564 (Mo.App.2008) (discussing admission of a videotape as a business record); *State ex rel. Casey's Gen. Stores, Inc. v. City of Louisiana,* 734 S.W.2d 890, 897 (Mo.App.1987) (discussing admission of cassette tapes as business records).

The autopsy photographs in this case recorded the condition of the victim's body at the time of the autopsy. Dr. Dudley testified that: as part of an autopsy, photographs are taken of the victim's body; the contact sheet containing the photographs was in the autopsy file; one of the photographs was a picture of the victim's identification tag, and the tag referred to the victim by name and referenced her case number; the records were kept in a locked and secure archive; as medical examiner, she was the custodian of the records; and exhibits 39 through 45 were enlarged versions of the photographs on the contact sheet and were fair and accurate copies of the photographs in the medical examiner's file. Dr. Dudley sufficiently testified that she was the custodian of the photographs, they were of the victim's body, and they were taken during the autopsy as part of the regular course of business of performing an autopsy. The trial court did not abuse its discretion in determining that the photographs were admissible as business records. *See also Rodriguez v. Modern Handling Equip. of NJ, Inc.,* 604 F.Supp.2d 612, 623 (S.D.N.Y. 2009) (pictures of a forklift attached to the forklift accident report were admissible as business records though the report was

---

graphs taken of a victim's body at the time of autopsy are testimonial. Thus, resolution of Tillman's third point does not require consideration of *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

inadmissible hearsay); *Corsi v. Town of Bedford*, 58 A.D.3d 225, 868 N.Y.S.2d 258 (N.Y.App.Div.2008) (aerial photograph was admissible as business record); *State v. Dumas*, 54 Conn.App. 780, 739 A.2d 1251, 1264 (1999) (photograph of defendant taken during booking process admissible as a business record); *Quinonez–Saa v. State*, 860 S.W.2d 704, 706–07 (Tex.App.1993) (discussing autopsy pictures being admissible as business records).

The point is denied.

## Conclusion

The judgment is affirmed.

All concur.