STATE of Missouri, Respondent,

v.

Joseph W. HASLETT, Appellant.

No. SD 28572.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 16, 2009.

Motion for Rehearing or Transfer
Denied Feb. 3, 2009.

 

Laura G. Martin, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERT S. BARNEY, Judge.

Joseph W. Haslett ("Appellant") appeals his conviction by a jury for one count of the Class A felony of murder in the second degree, a violation of section 565.021.[1] Following a jury trial, Appellant was sentenced by the trial court to life imprisonment in the Missouri Department of Corrections. Appellant asserts five points of trial court error. We affirm the judgment of the trial court.

Appellant does not challenge the sufficiency of the evidence to support his conviction. "Viewing the evidence in the light most favorable to the jury's verdict," *State v. Smith*, 185 S.W.3d 747, 751 (Mo.App. 2006), the record reveals that Appellant began dating Jennifer Harvey ("Mother") in April of 2005. Mother had a son named Gavin Jordan ("Child") from a previous relationship with Dustin Jordan ("Father").[2]

---

1. All statutory references are to RSMo 2000.

2. Child was born on March 18, 2004, and was approximately twelve months of age when Mother began dating Appellant.

Father's mother, Debra Davis ("Grandmother"), testified she often babysat for Child and in May or June of 2005 she began to notice "behavioral changes" in Child. She stated that Child began to be "extremely fussy and clingy" and had several physical injuries to various parts of his body. Grandmother stated that on July 24, 2005, she noticed "a bruise on [Child's] left cheek that look[ed] like he [had] been slapped" and in late August of 2005 she noticed "[h]e had a big bump, goose egg on his forehead, multiple bruises there. He had bruises underneath ... his jawline [and][h]is little head had a bald spot." In September of 2005, Grandmother contacted the Children's Division of the Missouri Department of Social Services ("the Division") because of the repeated bruising and injuries she witnessed on Child.[3] She stated that after making the hotline call Mother would no longer let her see Child on a regular basis and when she saw Child on October 1, 2005, Child "had a burn mark on his right hand above his pinkie."

Father testified that he noticed changes in Child beginning in the spring of 2005. He stated Child "would show up with a lot bruises" to parts of his body including his face. He stated that Child became "very shy" and "any time you would try to discipline him or raise your voice, he would go and hide in a corner, or he would just immediately start crying." Father testified that when he last saw Child in early October of 2005 "[h]is bruises had kind of gone away. He did have a slight bruise ... on his head" and a burn on his hand. Father was told by Mother that Child was burned on "a power washer" which "seemed pretty unlikely" to Father, who felt that Child was being abused.

Mother testified that in the summer of 2005 she started seeing injuries on Child such as "[s]ome bruising on his cheeks, there was some bruising down the back of his spine, he had a sprained leg." She stated Appellant told her Child had climbed or fallen out of his crib and caused the aforementioned injuries. She stated Child suffered a burn to his hand while in Appellant's care and that Appellant told her Child "had touched the muffler on the power washer."

Mother testified that on the morning of October 4, 2005, she awoke at 9:00 a.m. and Child and Appellant had gone to run errands. Later in the day, Mother stopped by Appellant's parents' house to get gas money from Appellant although she did not see Child at that time. Mother left Child with Appellant for the remainder of the day.

At 5:23 p.m. a 911 call was placed to the Greene County Sheriff's Department reporting that an eighteen-month-old child was not breathing and individuals on the scene were performing cardiopulmonary resuscitation in an effort to revive him. When Deputies Roger Lee ("Deputy Lee") and Douglas Browning ("Deputy Browning") arrived at the scene, they observed emergency medical personnel attempting to revive Child. At this point in time the officers made contact with Appellant who was "extremely upset;" crying "rather hysterically;" and "kept saying over and over again it was his fault." Appellant told Deputy Lee that Child "was taking a bath and that he had stepped outside to smoke a cigarette and that when he came back in the house, he found [Child] unconscious, laying on his side in the bathtub."

Appellant then told Deputy Stan Hancock ("Deputy Hancock") he "had taken a shower and when he got done he ... ran the bath water for [Child]." Appellant stated he ran the water to a level "about up to [Child's] naval" and "[h]e stepped

outside to go get a diaper bag and had smoked a cigarette while outside." He related that about five or six minutes later he returned to the bathroom and Child "was halfway in the tub, halfway out, appeared to be a little blue." Appellant also told Deputy Hancock that Child "was laying on [his] side in the bathtub," which was slightly different than his first account of events. Appellant related he then attempted to revive Child and he "wound up being revived and had gotten up and walked around a little bit." Appellant then called his mother while Child was "up walking around" and he related that Child "at one point . . . had peed on the floor." Appellant stated Child then "fell down . . . was not breathing" and Appellant called 911.

Child was transported to the hospital where he was pronounced dead.[4] Appellant remained at the scene. Sergeant James Farrell ("Sergeant Farrell"), a personal acquaintance of Appellant's family, spoke with Appellant and Appellant agreed to accompany Sergeant Farrell to the Sheriff's Department for an interview. At the Sheriff's Department, Sergeant Farrell advised Appellant of his *Miranda*[5] rights, which Appellant waived, and Appellant told Sergeant Farrell that he was giving Child a bath when he decided to go outside to smoke a cigarette; that he returned to find Child face down in the bathtub; that

Appellant pulled Child out of the bathtub; and that he then attempted to revive him. During the interview, Sergeant Farrell told Appellant that Child had passed away and that he did not believe Appellant's story that Child had drowned. Appellant then requested an attorney; however, he then changed his mind, again chose to waive his *Miranda* rights, and continued speaking to the police.

At that point, Chief Deputy Jim Arnott ("Chief Deputy Arnott") interviewed Appellant and Appellant initially told Chief Deputy Arnott that Child had drowned in the bathtub. Appellant then told Chief Deputy Arnott that he had been "in his daughter's bedroom and that he had put his full weight [against Child], [Child] landed on a corner of a bed which caused [Child] to go into a somersault, fly off the bed and then hit the metal bedframe and land on the floor." Appellant then made two partial written statements, but fell asleep while trying to do so.[6] Appellant was arrested for endangering the welfare of a child and taken to jail where he was placed on suicide watch.

The following day, on October 5, 2005, Appellant was again interviewed by Sergeant Farrell, and he again waived his *Miranda* rights. Appellant told Sergeant Farrell that he had been "wrestling around with [Child] and he had picked him up and

---

4. Deputy Hancock observed Child at the hospital and testified he saw a burn mark on Child's pinkie finger, some bruising on his head and neck, a bump on his head, and bruising along his jawline. Likewise, Detective Judy Duren Walker ("Detective Walker") testified she observed bruising to Child's back, bottom, jawline, and bottom lip; an injury on a finger of his right hand; a spot on his head that was missing some hair; a bump above his right eye; and injuries to his eye, nose and forehead.

5. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. Appellant's first written statement read: "Today, a very bad thing happened that I did not intentionally cause nor did I accidentally do something, and at no time knew that the outcome would be what it was. I know everybody expects an answer if I had—." Appellant's second written statement read: "While [Child] was in my care, a terrible thing happened that was not intentional nor an accident that was immediately recognized. I cannot change or make it go away. I feel like everybody really wants me to be this monster. It makes it easier to—."

put him in kind of a ... playful headlock and had picked [Child] up by the ankles with his other hand [in a] reverse airplane" and that he was carrying Child through the house when Child "started to shake and was unresponsive after that." Due to concerns about Appellant's mental health, he was transferred to a mental hospital "on a 96–hour mental watch hold." Thereafter, Appellant was released. Approximately a week after his release, Appellant told Mother that he had been playing with Child, "he had taken his diaper off, was flying him around like an airplane, that [Child] had gotten ... diarrhea, so he ran him into the bathroom and put him on the toilet, and he ... just went lifeless."

Appellant was arrested on December 14, 2005, and charged by Felony Information on March 16, 2006, with murder in the second degree and, in the alternative, abuse of a child, a violation of section 568.060. While awaiting trial, Appellant shared a jail cell with inmate Randy Reed ("Mr. Reed"). Mr. Reed testified at trial that Appellant told him several times that Child was injured while he was bathing him; however, on one occasion Appellant told him a different story. Mr. Reed related that Appellant told him he had given Child a bath and Appellant

> had [Child's] head between his arm and his body and he said [Child] was struggling, and he said he picked him up and [Child] was trying to catch his breath. And he said that [Child] started crying and stuff, and he said that's what gave him the idea about suffocat[ing] him. He said he put [Child's] head back under there and he put a lot of pressure on him and just held him there until he quit moving.

Mr. Reed testified that Appellant told him he suffocated Child because Mother had an abortion while they were dating and she had "killed his kid."

At the close of all the evidence, the jury convicted Appellant of murder in the second degree and he was sentenced by the trial court to life imprisonment. This appeal followed.

■ In his first point relied on, Appellant maintains the trial court "erred and clearly abused its discretion" in overruling his objection to the testimony of Dr. Douglas Anderson ("Dr. Anderson") and in allowing Dr. Anderson "who neither observed nor performed the autopsy on [Child], to testify about the autopsy performed by Dr. Paul Spence [("Dr. Spence")], whom the [S]tate claimed was unavailable to testify at trial." Appellant urges the trial court's rulings violated his "rights to cross-examine and to confront the witnesses against him ..." in that

> Dr. Spence was *not* an unavailable witness because: 1) the [S]tate failed to prove that Dr. Spence was unavailable to testify at trial by merely producing a doctor's note stating that Dr. Spence was currently under a doctor's care and not available to testify; and 2) the [S]tate failed to prove that a good faith effort was made to obtain Dr. Spence's presence at trial. Dr. Anderson's testimony regarding the autopsy was inadmissible hearsay that was admitted for the truth of the matter, and admission of Dr. Anderson's testimony in Dr. Spence's stead violated the Confrontation Clause.

■ "A trial court has broad discretion to admit or exclude evidence at trial." *State v. Madorie*, 156 S.W.3d 351, 355 (Mo. banc 2005). "This standard of review compels the reversal of a trial court's ruling on the admission of evidence only if the court has clearly abused its discretion." *Id.* " 'That discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.' "

*State v. Forrest*, 183 S.W.3d 218, 223 (Mo. 2006) (quoting *State v. Gonzales*, 153 S.W.3d 311, 312 (Mo. banc 2005)).

At trial, Dr. Anderson acknowledged that he did not perform the autopsy on Child, which was actually performed by Dr. Spence. Dr. Anderson related that he had reviewed the autopsy report of Dr. Spence; autopsy worksheets; Child's medical records; photographs taken at the scene of the crime; photographs taken during the autopsy; and "microscopic slides."[7] Based on the foregoing documentation, he rendered his own conclusions and opinions as to what caused Child's death. Dr. Anderson also related he could not speak on Dr. Spence's behalf and was basically offering a second opinion, which was common in his area of expertise.

Appellant urges in this point relied on that under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and *State v. Davidson*, 242 S.W.3d 409, 416–17 (Mo.App.2007), Dr. Anderson's testimony was inadmissible testimonial hearsay because "[t]he person who actually made the statements about what happened at the autopsy, Dr. Spence, was not under oath and not subject to cross-examination."

In *Crawford*, 541 U.S. at 51–52, 124 S.Ct. 1354, the Supreme Court of the United States established a new framework for addressing a criminal defendant's confrontation rights under the Sixth Amendment. Abrogating its previous decisions, the Supreme Court declared in *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354, that in order to admit the "testimonial" hearsay statements of an unavailable witness, the accused must have had an opportunity to confront or cross-examine, the witness. While *Crawford* did not offer a precise definition of testimonial statements, it did

suggest that testimonial statements are those made by witnesses who "bear testimony" and that "testimony" is defined as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* at 51, 124 S.Ct. 1354. The Court cited three useful "formulations of this core class of testimonial statements:" (1) "ex parte in-court testimony or its functional equivalent ... such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements contained ... in affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51–52, 124 S.Ct. 1354. *Crawford* found that the admission of testimonial hearsay without following the requirements set out in its opinion undoubtedly violated the Confrontation Clause. *Id.* at 51–52, 124 S.Ct. 1354.

In *Davidson*, 242 S.W.3d at 412, "the State introduced the report of a murder victim's autopsy and adduced testimony from a medical examiner;" however, "the medical examiner who testified did not perform the victim's autopsy or prepare the autopsy report." As a result, based on *Crawford*, the *Davidson* court concluded that "[w]hen an autopsy report is prepared for purposes of criminal prosecution, as this one was, the report is testimonial" and "[t]he court may not admit the report without the testimony of its preparer unless he or she is unavailable and the defendant had a prior opportunity for cross-examination." *Id.* at 417. Accordingly,

---

**7.** We note that the autopsy report prepared by Dr. Spence was not offered into evidence at trial.

the court determined that the "[a]dmission of the report and another medical examiner's testimony in lieu of the testimony of the medical examiner who prepared the report violated the defendant's Confrontation Clause rights." *Id.*

Before we determine whether Dr. Anderson's testimony is inadmissible testimonial hearsay as defined by *Crawford*, we must determine whether it is, indeed, hearsay at all. " 'A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted and that depends on the veracity of the statement for its value.' " *State v. Kemp*, 212 S.W.3d 135, 146 (Mo. banc 2007) (quoting *Forrest*, 183 S.W.3d at 224). However, Appellant does not point this Court to a single hearsay statement made by Dr. Anderson. In his testimony, Dr. Anderson described to the jury what *he* concluded from viewing the photographs of Child's injuries and what *his* opinion was as to the relevant medical evidence. Not once in direct examination did he mention a conclusion drawn by Dr. Spence or restate an opinion made by Dr. Spence.[8] The State did not move to introduce the autopsy report into evidence and Dr. Anderson only testified as to his own opinions and conclusions drawn from various medical sources and photographs. "Generally, an expert may rely on hearsay evidence as support for opinions, as long as that evidence is of a type reasonably relied upon by other experts in the field; such evidence need not be independently admissible." *State v. Brown*, 998 S.W.2d 531,

549 (Mo. banc 1999); *see State v. Candela*, 929 S.W.2d 852, 866 (Mo.App.1996) (holding that "[m]edical records and police reports, such as were purportedly relied on ... here, can be relied upon by expert witnesses in giving their opinions").

Furthermore, both *Crawford*, 541 U.S. at 42–60, 124 S.Ct. 1354, and *Davidson*, 242 S.W.3d at 416–17, are relevant to this analysis only in the situation where the autopsy report itself is admitted into evidence and its author is unavailable to testify such that the Confrontation Clause is triggered. That is not the situation in the present matter. The trial court did not abuse its discretion in overruling Appellant's Confrontation Clause objection to the testimony of Dr. Anderson. Point I is denied.

In his second point relied on, Appellant asserts the trial court plainly erred and abused its discretion in allowing Dr. Anderson to testify that Child's "injuries and death were caused by 'child abuse ...' " because such testimony "invaded the province of the finder of fact on the ultimate issue of murder in the second degree." Appellant argues that Dr. Anderson's expert testimony violates the general rule that an expert may "testify to his opinion regarding an ultimate issue in a criminal case, as long as the expert does not express an opinion on the guilt or innocence of the defendant...."

At trial, Dr. Anderson testified he was the current medical examiner for Greene County, Missouri, and was otherwise em-

---

8. We note there were several instances during the cross-examination of Dr. Anderson where Appellant's counsel specifically asked about the conclusions of Dr. Spence found in the autopsy report and how they compared with Dr. Anderson's findings. For example, Appellant's counsel asked Dr. Anderson, "[Dr. Spence's] conclusion is not the same as yours, is it?" to which Dr. Anderson replied, "No, not exactly." Further, Appellant's counsel

asked Dr. Anderson about Dr. Spence's conclusion that Child died from "homicidal violence" and mentioned Dr. Spence also found there was no evidence Child had drowned. "[A] defendant may not take advantage of self-invited error nor complain about matters he himself brings into the case." *State v. Uka*, 25 S.W.3d 624, 626 (Mo.App.2000). Accordingly, we need not address these statements in our analysis above.

ployed at Cox Hospital as a pathologist. He related he is board certified in anatomic and clinical pathology, is one of thirty-eight pathologists in the state that is a certified child death pathologist, and he had performed over 2,700 autopsies of which approximately 500 were on children. Dr. Anderson testified that having reviewed all the medical evidence relating to Child's death, he found many of Child's injuries to be "atypical" and "uncommon." He stated that some small bruises on Child's jaw were "suspicious for finger marks" and the fact that Child had injuries to his lips and frenulum suggested "some sort of force applied around the mouth." Further, he testified the burn on Child's hand was "consistent with a cigarette burn" and that injuries to Child's intestines were consistent with his abdomen having received "a forceful blow." Dr. Anderson stated that the foregoing injuries were "indicative of abuse;" were injuries which were "abusive in nature;" and were typical of injuries "routinely see[n] in cases involving child abuse." Dr. Anderson concluded that Child "[d]ied as a result of child abuse" based on his review of the medical evidence and he saw no evidence that Child had drowned.

■ Appellant did not object to Dr. Anderson's conclusions that Child died from child abuse and this issue was not included in Appellant's motion for new trial. "In order to properly preserve an evidentiary issue for appellate review, an objection must be made upon introduction of the evidence; that objection must be reasserted as error in a motion for new trial; and the issue must be briefed on appeal." *State v. Robinson*, 194 S.W.3d 379, 380 (Mo.App.2006). Conceding he failed to preserve this issue for appeal, Appellant requests plain error review under Rule 30.20.[9]

■ " 'The plain error rule should be used sparingly and [it] does not justify a review of every alleged trial error that has not been properly preserved for appellate review.' " *State v. Carr*, 50 S.W.3d 848, 853 (Mo.App.2001) (quoting *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990)), *abrogated on other grounds by Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). "Relief under the rule will only be granted if ... [Appellant] can show the action of the trial court was not only erroneous, but also the error so substantially impacted his rights that manifest injustice or miscarriage of justice will inexorably result if the error is left uncorrected." *State v. Kohser*, 46 S.W.3d 108, 111 (Mo.App.2001). "Plain errors are those which are evident, obvious, and clear." *Id.*

■ It is well-established law that " 'expert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence.' " *State v. Faulkner*, 103 S.W.3d 346, 360–61 (Mo.App.2003) (quoting *State v. Clements*, 849 S.W.2d 640, 644 (Mo.App.1993)). In a criminal case, an expert may testify concerning his or her opinion on an ultimate issue, but the testimony must aid the jury and not invade the jury's province. *Id.* at 361. "[A]lthough an expert witness ... should not be allowed to comment on the veracity of another witness ... an expert is allowed to testify as to his or her opinion on an ultimate issue in a criminal case as long as the opinion does not state that the defendant is guilty of the crimes." *State v. Fewell*, 198 S.W.3d 691, 697 (Mo.App.2006) (internal citation omitted). The admission of expert testimony is within the sound discretion of the trial court and shall not

9. All rule references are to Missouri Court Rules (2007).

be overturned absent an abuse of discretion. *State v. Tyra*, 153 S.W.3d 341, 348 (Mo.App.2005).

In the present matter, Dr. Anderson was obviously qualified as an expert witness such that he could offer his opinion on whether Child died as the result of child abuse. Having offered a detailed review of the medical evidence, Dr. Anderson concluded Child's injuries were consistent with child abuse based on his special knowledge in the area of child death pathology. Dr. Anderson never testified or inferred that it was Appellant who caused the injuries to Child and never opined on Appellant's guilt. *See Fewell*, 198 S.W.3d at 697. He merely offered his expert opinion that Child's injuries were consistent with a finding of child abuse and that Child's death was the result of that abuse. "Although there is a danger that jurors might be over-awed by the evidence presented by expert witnesses or might defer too quickly to the expert's opinion, the jury in the case at bar was not compelled by Dr. [Anderson's] testimony to believe that Appellant had committed the offense[ ] as charged." *Faulkner*, 103 S.W.3d at 361 (internal citation omitted). Here, Dr. Anderson's testimony was allowable expert testimony in that it did not invade the province of the jury. *Id.* "The jury was free to give Dr. [Anderson's] testimony the weight they thought it deserved and to draw the inferences they believed should be drawn from the evidence presented." *Id.* Appellant has failed to prove the trial court plainly erred in allowing Dr. Anderson's testimony. Point II is denied.

▪ Appellant's third and fourth points premise trial court error on the basis that the trial court permitted testimony from Lesa Newman ("Ms. Newman") and Mother regarding their observations that each saw Appellant place his hand, respectively, around Child's "head and throat" and "mouth." He maintains their testimony "was not legally relevant and its admission was prejudicial, in that it did not tend to establish an element that was at issue, was not strictly necessary to the [S]tate's case, and was admitted only to show [Appellant's] propensity to commit the charged crime." We review both points conjunctively.

Ms. Newman, who lived next door to Appellant's parents, testified that on September 23, 2005, she saw Appellant's truck parked outside her house. When she approached the truck she saw Child, who was naked, lying on his side on Appellant's lap and Appellant had his hands around Child's face and throat. She also noticed a diaper on the floor of the truck and feces on the seats of the truck and on Child. When Ms. Newman knocked on the window of the truck, she startled Appellant, who asked her for help because Child was choking. Ms. Newman opened the door of the truck and took Child from Appellant. She noted Child was crying, but not making much noise; his neck and upper chest were "very red;" and one of his eyes was swollen shut. Appellant told Ms. Newman that Child had been eating Cheetos when he started to choke. Ms. Newman saw a Cheetos in Child's hand and when she opened Child's mouth with her fingers she found orange residue inside. She stated Child calmed down shortly and appeared to be fine. She stated Appellant seemed "nervous" and "agitated" throughout the incident.

Also, Mother testified that one morning in the summer of 2005, she awoke to Child's "muffled" cries and when she got up to investigate, she found Appellant holding Child in his lap and Appellant's hands were "close to [Child's] mouth." Appellant told Mother that Child had been choking and he was trying to help him. Mother testified that when she took Child from Appellant there was nothing in

Child's mouth and he did not appear to be choking.

As previously related, a "trial court has broad discretion to admit or exclude evidence at trial" and will only reverse such rulings when the trial court has abused its discretion. *Madorie,* 156 S.W.3d at 355.

■■■■ "'It is generally recognized that a criminal defendant has a right to be tried only for the offense for which he is charged.'" *State v. Turner,* 242 S.W.3d 770, 777 (Mo.App.2008) (quoting *State v. Johnson,* 161 S.W.3d 920, 924 (Mo.App. 2005)). "The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). However, "[t]here are exceptions to [this] rule." *Id.* Evidence of other, uncharged misconduct is admissible and "has a legitimate tendency to prove the specific crime charged when it 'tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; or (5) the identity of the person charged with the commission of the crime on trial.'" *Id.* (quoting *State v. Sladek,* 835 S.W.2d 308, 311 (Mo. banc 1992)).

In the present matter, the testimony offered by both Ms. Newman and Mother was admissible in that it showed Appellant's intent in harming Child, motive, i.e., *animus* directed toward Child, and the absence of mistake or accident.[10]

■■■■ Ms. Newman's testimony that she witnessed Appellant with his hands around Child's face and mouth presenting the possibility of choking Child was evidence from which the jury could have determined Appellant's intent and motive to purposely injure Child. Likewise, Mother's testimony that she heard "muffled" cries from Child and then found Appellant with his hands near Child's mouth was evidence Appellant had the intent to purposely harm Child. "Evidence of prior mistreatment of a child may be considered in establishing the intent required for second-degree murder." *State v. Padberg,* 723 S.W.2d 43, 45 (Mo.App.1986); *see also Gennetten v. State,* 96 S.W.3d 143, 150 (Mo.App.2003). The testimony of both women illustrated that Child's injuries were not the result of an accident in that Appellant had attempted to injure Child on previous occasions. Furthermore, in opening statement counsel for Appellant clearly informed the jury that the present case was "a terrible tragedy, an accident." With that in mind, the testimony of Mother and Ms. Newman about Appellant's prior actions toward Child was admissible to show an absence of mistake or accident. *See Sladek,* 835 S.W.2d at 311; *Padberg,* 723 S.W.2d at 45.

■■■■ Additionally, "[e]vidence of prior misconduct of the defendant, although not admissible to show propensity, is ad-

---

10. *See State v. Franklin,* 854 S.W.2d 55, 58 (Mo.App.1993) (holding that in a trial for the murder of a child, evidence of defendant's previous malnourishment of the child "was probative of [defendant's] feelings for the child" and the "jury could infer from it that [defendant] intended to cause [the child] serious physical injury"); *State v. Mattingly,* 573 S.W.2d 372, 374 (Mo.App.1978) (holding that evidence of defendant's prior mistreatment of child was admissible on the issue of intent where defendant was charged with the child's murder); *State v. Patterson,* 443 S.W.2d 104, 107 (Mo. banc 1969) (holding that where defendant was charged with assaulting a child by beating her with a dog collar, evidence that he previously beat her with a pole and other objects was admissible to prove motive and intent).

missible if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial," and "if the evidence is legally relevant, in that its probative value outweighs its prejudicial effect." *Bernard,* 849 S.W.2d at 13. "The balancing of the effect and value of evidence rests within the sound discretion of the trial court." *Id.* Here, their respective testimony would be admissible in that such testimony was legally and logically relevant and tended to prove that Appellant was guilty of causing Child's death.[11] The trial court did not abuse its discretion in allowing the testimony from Ms. Newman and Mother that Appellant had attempted to injure Child on previous occasions. Points III and IV are denied.

In his fifth point relied on Appellant asserts the trial court erred in overruling his motion to suppress and in allowing Appellant's statements to various law enforcement personnel to be admitted at trial in that

1) [Appellant] was subjected to custodial interrogation without being warned of his *Miranda* rights; 2) [Appellant's] erratic mental state, emotional swings, and suicidal behavior and statements demonstrated that he was unable to make a knowing, voluntary and intelligent relinquishment of his known rights and privileges and abandonment of his right to remain silent and to refrain reinitiating contact with law enforcement officers;

and 3) law enforcement officers gave *Miranda* warnings to [Appellant] after he had already made unwarned statements.

Appellant maintains "the oral and written statements that [Appellant] gave to officers both before and after the *Miranda* warnings must be excluded."

Here, when officers responded to Appellant's parents' home and found Child unresponsive, Appellant made several unsolicited statements to police at the scene while Child was being treated by paramedics. From the testimony of the officers, it appears Appellant was distraught, crying rather hysterically, and screaming statements such as "take me, take me" and "I don't deserve to live. Kill me, somebody needs to kill me." Further, at the scene Appellant told the officers that Child drowned in the bathtub while he was outside smoking and that the injuries to Child were his "fault."

After Child was removed from the scene and taken to the hospital, Sergeant Farrell spoke with Appellant as he sat in the garage at his parents' home. At that time, Appellant was not under arrest, was not in handcuffs, and had been freely speaking to the officers for a long period of time as they searched the home and began investigating the scene. Appellant agreed to ride to the Sheriff's Department with Sergeant Farrell and he was not restrained during the ride. Once they arrived at the Sheriff's Department, Appellant was advised of

11. *See State v. Applegate,* 668 S.W.2d 624, 632 (Mo.App.1984) (holding that where the defendant was charged with murdering a child "evidence of other assaults upon the infant's person was relevant, admissible, and had a logical tendency to prove the defendant's guilt"); *State v. Letterman,* 603 S.W.2d 951, 956 (Mo.App.1980) (holding that evidence of scalding the child victim on a previous occasion "was relevant, admissible, and had a logical tendency to prove defendant's guilt" where "the evidence unmistakably shows a series of interrelated assaults upon the infant victim, the last of which was fatal"); *State v. Williams,* 865 S.W.2d 794, 804 (Mo.App. 1993) (holding that evidence defendant had previously beaten the child he was charged with murdering was relevant in a case where the prior misconduct of defendant was directed to the victim of the offense for which he was on trial, and the trial court did not abuse its discretion in determining that its probative value outweighed its prejudicial effect).

his *Miranda* rights by Sergeant Farrell, he waived those rights verbally and in writing, and continued to speak with Sergeant Farrell.

After a short break in the interrogation, Sergeant Farrell informed Appellant that Child had passed away. Sergeant Farrell testified that when he told Appellant Child had died and that he "didn't believe the story about [Child] drowning in the tub, [Appellant] informed [Sergeant Farrell] he wanted an attorney." At that time, Sergeant Farrell informed Appellant he "was done talking to him" and he had to end the interview due to Appellant's request for an attorney. Appellant then indicated he "had not specifically requested an attorney" and "[h]e wanted to continue talking. . . ." Sergeant Farrell testified that they were interrupted several times at that point by Chief Deputy Arnott who had information relating to Child's death and Sergeant Farrell "stepped out" of the interrogation room a few times. When Sergeant Farrell sat down with Appellant to begin questioning him again, he advised him for a second time of his *Miranda* rights. Appellant again signed the waiver of rights form and proceeded to speak with Sergeant Farrell.

Later in the interrogation, Sergeant Farrell felt that Appellant was lying to him so he asked Chief Deputy Arnott to take over the questioning. Appellant spoke with Chief Deputy Arnott for a period of time and even wrote two partial, written statements. Appellant was interviewed that evening for a total of five hours and, after the interview was concluded, he was arrested.

The following day on October 5, 2005, Sergeant Farrell wanted to speak to Appellant again. Prior to initiating the interview, Sergeant Farrell again advised Appellant of his *Miranda* rights at which time Appellant stated "he wanted an attorney." Sergeant Farrell told him he could not question him, "stood up, started to [get] out [his] handcuffs, and told [Appellant] he was going back [to] jail." Appellant then stated he wanted to speak with Sergeant Farrell, who again advised him of his *Miranda* rights. Appellant then waived his *Miranda* rights verbally and in writing. Sergeant Farrell then proceeded to interview Appellant for approximately two and a half hours.

In his motion to suppress filed prior to trial, Appellant asserted all of his statements to police "were not voluntary;" thus, they should be suppressed. A hearing was held on this motion and the motion was ultimately overruled by the trial court. Accordingly, at trial the various police officers testified as to the nature of the statements made by Appellant and certain videotaped portions of the interrogations were played for the jury. Appellant continually objected to the testimony and the objections were overruled by the trial court. This allegation of error was then included in Appellant's motion for new trial.

■■■ Appellate review of a trial court's ruling on a motion to suppress is limited to a determination of whether the evidence was sufficient to support the finding. *State v. Edwards*, 116 S.W.3d 511, 530 (Mo. banc 2003). This Court will view the evidence in a light most favorable to the judgment and will reverse the judgment only if clearly erroneous. *Id.* The Court will consider all evidence presented at trial, including evidence presented at a pre-trial hearing. *Id.* "Deference is given to the trial court's superior opportunity to determine the credibility of witnesses. As in all matters, a reviewing court gives deference to the trial court's factual findings and credibility determinations, but reviews questions of law de novo." *State v. Rousan*, 961 S.W.2d 831, 845 (Mo. banc 1998).

It is well-settled law that "[a] *Miranda* warning is not required every time the police question an individual" and "[t]his warning is only required to be given prior to any custodial interrogation of a criminal suspect." *State v. Newberry*, 157 S.W.3d 387, 399 (Mo.App.2005). It is clear "that a person who is asked preliminary, investigative questions by police is not in custody" and need not be advised of his or her rights under *Miranda*. *Id.*

Here, Appellant initially made certain declarations to the officers when they arrived on the scene and then, after Child was taken to the hospital, he made several statements to Sergeant Farrell while sitting in his parents' garage. The record shows that Appellant was not restrained in any manner during this time, was freely moving around the premises, was being asked questions as part of the investigative process, and was not being subjected to a custodial interrogation at this time. Appellant's voluntary statements to police which were made while at his parents' home were admissible in that they were freely made prior to custodial interrogation and as the result of preliminary, investigative questions. *See Newberry*, 157 S.W.3d at 399.

Appellant next complains about the statements he made at the police station to Sergeant Farrell after he was informed that Child had passed away. "Determining whether the right to counsel has been violated during a custodial interrogation requires a two-step analysis." *State v. Lanos*, 14 S.W.3d 90, 94 (Mo.App. 1999). "First, we must determine whether an accused invoked his or her right to counsel." *Id.* "[O]nce a criminal defendant has asserted his constitutional rights to speak with an attorney, all interrogation of the defendant must cease until such time as counsel is made available to him." *State v. Farris*, 125 S.W.3d 365, 369 (Mo. App.2004). "Interrogation or other questioning may not resume 'unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). "To invoke the right to counsel, an accused must make an unambiguous and specific request for counsel in dealing with a custodial interrogation." *Lanos*, 14 S.W.3d at 94. "The question of whether an accused has invoked the right to counsel is objective." *Id.* "An accused must articulate his or her desire to have counsel present sufficiently clearly that a reasonable police officer, in the circumstances, would understand the statement to be a request for an attorney." *Id.*

Having waived his *Miranda* rights upon arrival at the police station, Appellant was informed of Child's death at which time he stated, "I guess I probably need an attorney then" and Sergeant Farrell correctly terminated his questioning per the *Miranda* edict. Shortly thereafter, Appellant changed his mind and, as Appellant testified at the motion to suppress hearing, voluntarily "decided [he] was going to talk to [Sergeant Farrell] a little bit. . . ." It is clear Appellant willingly initiated contact with Sergeant Ferrell and expressed his desire to continue questioning. *See Farris*, 125 S.W.3d at 369. Appellant then verbally and in writing waived his *Miranda* rights for the second time and subjected himself to questioning once again. "'If one is informed of his right to remain silent under *Miranda*, and understands his right to remain silent under *Miranda* . . . it is absurd to say that such person has not made a knowing and intelligent waiver of his right to remain silent.'" *State v. Cook*, 67 S.W.3d 718, 723 (Mo.App.2002) (quoting *State v. Bucklew*, 973 S.W.2d 83, 90 (Mo. banc 1998)). While Appellant urges his distraught emotional state prevented him from voluntarily waiving his rights a sec-

ond time, "[a]bsent police coercion, evidence of the defendant's physical or emotional condition alone is not sufficient to demonstrate that his or her confession was involuntary." *State v. Jackson,* 248 S.W.3d 117, 123 (Mo.App.2008). " 'There is no constitutional right to confess only when totally rational and properly motivated.' " *Cook,* 67 S.W.3d at 723 (quoting *State v. Lyons,* 951 S.W.2d 584, 590 (Mo. banc 1997)). In that there were no allegations or evidence of police coercion in the present matter, even if Appellant was distraught, he "knowingly, voluntarily, and intelligently waived the previously invoked right to counsel." *Lanos,* 14 S.W.3d at 94.

█ Lastly under this point relied on, Appellant takes issue with his interrogation which took place on October 5, 2005. At the outset of this interview, Appellant invoked his right to counsel and Sergeant Farrell correctly told Appellant he could not speak to him such that he would merely take Appellant back to his jail cell. Appellant again changed his mind and decided to speak with Sergeant Farrell. He was informed of his *Miranda* rights and he signed the waiver of rights form. At the motion to suppress hearing, Appellant informed the trial court that he "understood" the form and "wanted to talk to Sergeant Farrell." Further, he testified he was not threatened, coerced, or promised anything by Sergeant Farrell during the interrogation. Here, Appellant "knowingly, voluntarily, and intelligently waived the previously invoked right to counsel" such that his statements made to Sergeant Farrell were admissible. *See Lanos,* 14 S.W.3d at 94. The trial court did not err in overruling Appellant's motion to suppress. Point V is denied.

█ Lastly, in his Point VI Appellant asserts the trial court plainly erred in overruling his motion to suppress and in admitting his statements to the police officers discussed in Point V above, in that

"the trial court adopted the entire [S]tate's Response to Defendant's Motion to Suppress Statement, but for the opening paragraph, one heading, the signature block, and the certificate of service, as the court's ruling on the motion without exercising the court's own independent judgment."

While not raised before the trial court or included in his motion for new trial, Appellant now requests plain error review of the fact that the trial court incorporated a large portion of the State's response to the motion to suppress in drafting its order denying the motion. As already stated, "[r]elief under the [plain error] rule will only be granted if ... [Appellant] can show the action of the trial court was not only erroneous, but also the error so substantially impacted his rights that manifest injustice or miscarriage of justice will inexorably result if the error is left uncorrected." *Kohser,* 46 S.W.3d at 111.

As previously related, Appellant asserted in his motion to suppress that his statements to the police officers involved in this case were involuntary and should be excluded from evidence at trial. In response to the motion to suppress, the State filed its "Response to [Appellant's] Motion to Suppress Statements" and Appellant filed his "Suggestions in Support of [Appellant's] Motion to Suppress Statements." The trial court disagreed with Appellant and overruled his motion to suppress.

Although it is not necessary to set out both the trial court's "Order Denying [Appellant's] Motion to Suppress Statements" and the State's "Response to [Appellant's] Motion to Suppress Statements" verbatim, it appears that the first paragraph of both documents is dissimilar; that the State's document contains two headings and the trial court's order includes only one heading; and that the signature block and certificate of service are different. In all

other aspects, the text of both documents is identical.

■ "Adopting all or part of a party's proposed findings, or adopting by reference the wording of a party's motion, has become a common practice among lawyers and judges in both criminal and civil cases." *State v. Kenley,* 952 S.W.2d 250, 261 (Mo. banc 1997). "In the absence of independent evidence that the court failed to thoughtfully and carefully consider the claims, 'there is no constitutional problem with the court adopting in whole or in part the findings of fact and conclusions of law drafted by one of the parties.'" *State v. Link,* 25 S.W.3d 136, 148 (Mo. banc 2000) (quoting *State v. Ferguson,* 20 S.W.3d 485, 510 (Mo. banc 2000)). While "[t]he judiciary is not and should not be a rubber-stamp for anyone," *State v. Griffin,* 848 S.W.2d 464, 471 (Mo. banc 1993), there is nothing in the record to suggest the trial court's decision was not "thoughtfully and carefully" considered. *Link,* 25 S.W.3d at 148. Accordingly, under the plain error standard of review, Appellant has not shown the trial court's adoption of the State's motion so substantially impacted his rights as to cause manifest injustice or a miscarriage of justice. The trial court did not err in adopting portions of the State's motion. Point VI is denied.

The judgment and sentence of the trial court is affirmed.

SCOTT, P.J., and BATES, J., concur.