**STATE of Missouri,
Plaintiff/Respondent,**

**v.**

**Quintin GRAY, Defendant/Appellant.**

**No. ED 94420.**

Missouri Court of Appeals,
Eastern District.

May 17, 2011.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 26, 2011.

Application for Transfer Denied
Oct. 4, 2011.

494

Timothy A. Blackwell, Jefferson City, MO, For Plaintiff/Respondent.

1. The Court intends no disrespect by referring to M.T.'s mother and grandmother by their

Timothy J. Forneris, St. Louis, MO, For Defendant/Appellant.

SHERRI B. SULLIVAN, P.J.

*Introduction*

Quintin Gray (Appellant) appeals from the trial court's judgment entered upon a jury verdict convicting him of second-degree murder and abuse of a child (causing death). We affirm.

*Factual and Procedural Background*

On August 10, 2009, the State charged Appellant with first-degree murder and abuse of a child causing death. The evidence presented at trial, viewed in the light most favorable to the verdict, is as follows.

M.T., the daughter of Ashley Turner (Ashley)[1], was born on September 14, 2004. In February 2008, Ashley was living in an apartment with her boyfriend, Appellant, and M.T. Appellant was not M.T.'s father. Appellant's four-year-old son, Q.G., lived with his mother but also spent time at Ashley's and Appellant's apartment. On February 24, 2008, Appellant took M.T. and Q.G. outside to play in the backyard with the family dogs.

After the children came inside, Ashley bathed them. Ashley testified that M.T. had small dents in her palms from catching herself on the gravel, a small nick on her knee, and a welt under her eye from playing outside. Ashley then fed the children dinner, but M.T. spit her food out. M.T. was constipated that day so Ashley took M.T. to the bathroom to have a bowel movement. Afterwards, M.T. felt better and Ashley put the children to bed.

The next morning, Ashley left for work shortly after 6:00 a.m., leaving M.T. at

first names.

home in Appellant's care with Q.G. Neachelle Gentry (Gentry), the downstairs neighbor, testified that she heard a lot of unusual noises coming from Ashley's and Appellant's apartment for about 30 to 45 minutes that morning. Gentry testified that it sounded as if something heavy, like furniture, was being moved across the floor.

Around 10:30 or 11:00 a.m., Ashley received a call from Appellant and rushed home. When Ashley arrived home, M.T. was on the floor and the paramedics were giving her CPR. Ashley noticed a pair of M.T.'s underwear in the bathtub with feces in it but it was not the pair M.T. had worn to bed the night before. Ashley rode to the hospital in the ambulance with M.T. while a friend drove Appellant and Q.G. to the hospital.

M.T. arrived at the hospital in full cardiac arrest. Emergency room physician Dr. James Matthew Gerard (Dr. Gerard) testified that M.T. had a contusion or swelling on her forehead and multiple abrasions, lacerations, and bruises, many of which appeared fresh. Despite emergency treatment, M.T. died.

Detective Robert Jauer (Jauer) responded to the hospital. Jauer talked to Q.G. alone about what had happened to M.T. Q.G. stated that Appellant had whipped M.T. with a belt and his fist. Q.G. later told Jauer that after M.T. "got a whipping," Appellant gave M.T. a bath.

Q.G. was next interviewed at the Children's Advocacy Center, and then by Christina Hemkens (Hemkens), a social worker with the Children's Division. Hemkens testified Q.G. stated that Appellant "whooped" M.T. because she wet the bed and was not listening. He choked her with a belt, threw her on the ground and punched her in the stomach. Q.G. stated Appellant then gave M.T. a bath and M.T. got sick. Q.G. stated Appellant then tried to "make [M.T.] alive" by pushing on her stomach three times.

Detective Jimmy Hyatt (Hyatt) testified that when the police arrived at the apartment to investigate, the water was running in the bathtub and there was a pair of underwear in the bathtub with fecal matter in it.

The autopsy report indicated that M.T. had internal injuries including a lacerated liver, and that she died from abdominal blunt trauma. The report also indicated that M.T. had numerous external injuries, including abrasions on her cheek, forehead, chin, lips, arms, back, buttocks, hand and leg and contusions on her forehead, temple, cheeks, wrist, back, hand and buttocks. M.T. also had a scar on the back of her right hand that appeared to be a previously healed thermal injury. Hyatt testified Ashley told him that there were injuries to M.T. that she had not seen before and that Ashley could not explain all but a few of M.T.'s external injuries.

Ashley testified that M.T. was healthy and did not have a heart problem; M.T. was toilet-trained and never had any accidents; Ashley was responsible for disciplining M.T.; and the weekend before her death, Ashley "popped" M.T. on the butt and arm with a house shoe and had possibly twice hit M.T. with a belt. Ashley testified Appellant gave Q.G. a "whooping" with a belt that same weekend for peeing on himself.

Ashley had only once left M.T. with Appellant prior to the incident. A couple of days before Christmas 2007, Ashley came home and discovered M.T. had a blistering burn covering her hand for which she took M.T. to the emergency room for treatment. Ashley testified that she was initially told that M.T.'s hand was burned when she tripped over the dogs while playing with water in the bathroom. M.T. later told Ashley that Appellant had

burned her hand. After this, M.T. wanted to stay with Ashley's mother, Vickie Turner (Vickie) all of the time. Vickie testified that shortly before Christmas 2007, M.T.'s hand was burned and that after it appeared M.T. did not want to go home and afterwards always wanted to stay with Vickie.

Dr. Gerard testified M.T.'s injuries were not consistent with a minor fall, hitting her head on something, or playing with dogs. Dr. Gerard stated it would be unlikely for someone to sustain all of these injuries in a single fall and he "would absolutely consider [M.T.'s injuries to be] consistent with abusive behavior or suspicion of abusive type of injuries." Dr. Gerard opined that the liver is a "tough" organ which is well protected, taking a tremendous amount of force to lacerate it, and he had only seen accidental liver lacerations occur in children involved in high force mechanism accidents such as vehicle accidents. Dr. Gerard testified M.T.'s internal injuries were not consistent with chest compressions but were from a very forceful blow. Dr. Gerard had never seen nor heard of a case where any manner of CPR caused a liver laceration and he did not believe that any kind of compression, including properly or improperly performed CPR, could cause this type of liver injury because a compression could not generate enough force in light of the elasticity of the chest wall.

Dr. Gerard stated that cardiac arrhythmia in children is relatively uncommon, and is usually accompanied by an underlying infection. The child would exhibit symptoms such as shortness of breath, weakness, or tiredness for days or weeks and it is extremely unlikely for a three-year-old with no history of heart problems to suddenly manifest arrhythmia or a primary heart defect.

Dr. Jane Turner (Dr. Turner), a forensic pathologist and medical examiner, performed the autopsy on M.T. Dr. Turner testified that she did not observe any post-mortem damage to M.T. and that the abrasions on M.T. appeared red, which indicates that M.T.'s heart was still beating when they were inflicted. While some of the injuries may have occurred within a day or two of death, most of M.T.'s external injuries were inflicted concurrent to her death.

Dr. Turner testified that M.T.'s liver had two very large lacerations and, given their location, would have bled very quickly. Dr. Turner testified her exam revealed that approximately 30 to 33 percent of M.T.'s blood volume, a significant amount of blood loss, had settled in her abdominal cavity and was sufficient to kill M.T. by causing M.T.'s body to shut down from shock.

Dr. Turner examined M.T.'s heart and found nothing wrong with it and no evidence of cardiac dysrhythmia or arrhythmia. Dr. Turner testified that M.T.'s heart stopped because she lost a significant volume of blood. Dr. Turner stated that if M.T.'s heart had stopped before the liver was lacerated, she would have expected to see little or no blood in M.T.'s abdomen. Dr. Turner testified that the amount of blood in M.T.'s abdominal cavity indicates that her liver was lacerated before her heart stopped. In addition, M.T. had acute congestion, or accumulated blood, in her lungs, which indicates that M.T. was alive for a while after she was injured.

Dr. Turner testified that liver lacerations are normally associated with the application of force seen in motor vehicle accidents. Dr. Turner has never seen CPR cause a liver laceration and that CPR cannot cause liver lacerations because compressions are not compatible with the sudden forceful blow necessary to cause a laceration. Dr. Turner stated that a sudden forceful blow consistent with a car accident would be a kick, a punch, or a full

body knee drop, and that such a blow to the abdomen could cause an involuntary bowel movement.

In addition, Dr. Turner testified that there were hemorrhages in the tissue around M.T.'s intestines, in her colon, on each side of her scalp, and in the soft tissue of the neck, indicating there was some manipulation of her neck consistent with strangulation or intubation.

Appellant did not testify at trial but called Dr. Thomas Young (Dr. Young), a forensic pathologist, to testify on his behalf. Dr. Young opined that the liver lacerations were caused by CPR and did not cause M.T.'s death.

The jury found Appellant guilty of second-degree murder and abuse of a child resulting in death. On February 19, 2010, the trial court sentenced Appellant to concurrent 25–year sentences on each count. This appeal follows.

### Points Relied On

In his first point, Appellant argues the trial court erred in excluding a 911 call as hearsay because it was admissible under the excited utterance exception to the hearsay rule. Appellant contends that the exclusion of the 911 call denied him his right to due process of law, to present a defense, and to a fair trial in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10 and 18(a) of the Missouri Constitution, and substantially prejudiced him and affected the outcome of the trial.

In his second point, Appellant argues the trial court erred in excluding the reenactment video because it was part of the police investigation and the State opened the door to its admission. Appellant contends the exclusion of the video reenactment denied him his rights to due process of law, to present a defense, and to a fair trial in violation of the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution and Article I, Section 10 and 18(a) of the Missouri Constitution, and that the exclusion of the video substantially prejudiced Appellant and had a decisive effect on the jury's verdict.

In his third point, Appellant argues the trial court abused its discretion in overruling his objection and request for a mistrial as to the testimony of Ashley and Vickie that Appellant burned M.T.'s hand because the evidence was not legally relevant and deprived Appellant of his rights to due process, to a fair trial, and to be tried only for the charged offenses in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10, 17 and 18(a) of the Missouri Constitution.

In his fourth point, Appellant argues the trial court abused its discretion in permitting Dr. Gerard to testify that M.T.'s injuries were indicative of child abuse in violation of Appellant's rights to due process of law, to a fair trial, and to be judged by a fair and impartial fact-finder, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 18(a) of the Missouri Constitution because the testimony was outside the doctor's expertise for which he was qualified to testify, and invaded the province of the finder of fact on the ultimate issue of Appellant's guilt.

In his fifth point, Appellant argues the trial court abused its discretion in excluding Dr. Young's testimony that (1) M.T.'s liver lacerations were caused by improper CPR; (2) the cause of death was undetermined because he knew that M.T. went into cardiac arrest and the liver laceration did not produce enough blood to cause her death; (3) without more information, he could not tell what the actual cause of death was because he did not have enough

heart tissue with which to decide what caused her heart to stop; and (4) M.T.'s postmortem injuries would have been from a fall in the bathroom after she went into cardiac arrest and any splashing of water to the face. Appellant contends the exclusion of this evidence violated his rights to due process of law, a fair trial, and to be judged by a fair and impartial fact-finder, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution, in that the testimony was not solely based on Appellant's statements, but also on the statements of emergency personnel in the police reports and the State opened the door to the admission of this evidence.

In his sixth point, Appellant argues the trial court erred in denying his motion for judgment of acquittal at the close of the evidence and in entering judgment and sentence against him for conventional second-degree murder and abuse of a child resulting in death, in violation of Appellant's rights against double jeopardy, to due process and to a fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 10 and 18(a) of the Missouri Constitution and Section 556.041 [2] because his conviction and sentence for both constitutes multiple punishments for the same offense.

### Standard of Review

■■■ The trial court has broad discretion when ruling on the admission or exclusion of evidence at trial, and this Court will not disturb the court's ruling absent a showing of an abuse of that discretion. *State v. Kemp*, 212 S.W.3d 135, 145 (Mo. banc 2007). "[T]hat discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id.* We will reverse on claims of error in the admission of evidence only if the error was so prejudicial that it deprived the defendant of a fair trial. *Id.* "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *Id.* at 145–46.

■■■ Those points that Appellant did not properly preserve for appellate review are subject to plain error review. Rule 30.20; [3] *State v. Johnson*, 220 S.W.3d 377, 385 (Mo. App. E.D.2007). Under this review, we will reverse when a plain error affecting a substantial right results in manifest injustice or a miscarriage of justice. Rule 30.20; *Johnson*, 220 S.W.3d at 385. It is the defendant's burden to demonstrate that the error prejudiced him. *Johnson*, 220 S.W.3d at 385.

### Discussion

#### Point I—Exclusion of the 911 tape

In his first point, Appellant argues that the trial court abused its discretion in refusing to admit and play for the jury a tape of the 911 call that Appellant made on the morning of M.T.'s death. The trial court denied Appellant's request for its admission, finding that Appellant was offering the tape to prove the truth of Appellant's statements made during the call. Appellant contends that the 911 call comes within the excited utterance exception to the hearsay rule and, therefore, should have been admitted. Appellant argues its omission affected the verdict because the jurors were never given a complete picture of the morning M.T. died, including the fact that Appellant had called 911 and attempted CPR.

---

2. All statutory references are to RSMo 2006, unless otherwise indicated.

3. All rule references are to Mo. R.Crim. P.2011, unless otherwise indicated.

■ Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. *State v. Douglas*, 131 S.W.3d 818, 823 (Mo.App. W.D.2004). Hearsay statements are, as a rule, inadmissible. *Id.* "The excited utterance exception to the rule against hearsay applies when: (1) a startling event or condition occurs; (2) the statement is made while the declarant is still under the stress of the excitement caused by the event and has not had an opportunity to fabricate the story; and (3) the statement relates to the startling event." *State v. Hedges*, 193 S.W.3d 784, 788 (Mo.App. E.D.2006). Alleged excited utterances are presumably inadmissible hearsay and the party offering the statements has the burden of making a sufficient showing of spontaneity to render the statements admissible. *State v. Kemp*, 919 S.W.2d 278, 280 (Mo.App. W.D. 1996).

■ "Among the factors to be considered in determining whether an excited utterance exists are (1) the time between the startling event and the declaration, (2) whether the declaration is in response to a question, (3) whether the declaration is self-serving, and (4) the declarant's physical and mental condition at the time of the declaration." *Kemp*, 212 S.W.3d at 146. No one factor necessarily results in automatic exclusion and all should be considered in determining whether the statement was the result of reflective thought. *Id.* "The essential test for admissibility of a spontaneous statement or excited utterance is neither the time nor place of its utterance but whether it was made under such circumstances as to indicate it is trustworthy." *Id.*

■ Appellant made an offer of proof as to the 911 tape. On the 911 call, Appellant requested an ambulance, stating that his daughter was not breathing. After giving the dispatcher his address, Appellant stated that when he woke up he discovered that M.T. had made a bowel movement in her underwear and that he washed her up. Appellant was interrupted by the dispatcher trying to ascertain Appellant's contact information. Appellant stated that M.T. was making noises and asked repeatedly if that meant that she was still alive. Appellant stated that he was doing CPR. The dispatcher gave Appellant instructions on how to breathe into M.T.'s mouth and give her chest compressions. The dispatcher asked Appellant how long he had been doing CPR and Appellant responded "about 10 minutes." The dispatcher asked Appellant what had happened, and Appellant said that he had no idea but that M.T. woke up light-headed and had a bowel movement in her underwear. Appellant stated that he took M.T. into the bathroom, washed her, and that M.T. then started hitting her lip and her head on the bathtub.

The 911 tape was not admissible under the excited utterance exception to the hearsay rule. Shortly into the call, Appellant advised the dispatcher that he had already been performing CPR for 10 minutes. This time period seemingly does not include the time between Appellant's alleged discovery that M.T. was ill and when he began CPR, including taking M.T. to the bathroom and bathing her. "An important factor in determining admissibility is whether the speaker has had the opportunity to fabricate the statement." *State v. Stottlemyre*, 752 S.W.2d 840, 843 (Mo. App. W.D.1988). By the time Appellant called 911, M.T. was in significant distress, for which Appellant surely knew he would be asked to account. Appellant's self-serving exculpatory statements came at least 10 minutes after the startling event, when M.T. was showing sufficient signs of distress for Appellant to initiate CPR, and provided Appellant with ample time to fabricate his statements.

In addition, while some of Appellant's statements were in response to the dispatcher's questions, Appellant almost immediately and spontaneously offered substantial information to the dispatcher about the events that had transpired much earlier. Also, the trial court listened to the 911 recording and was able to assess Appellant's tone and statements at the time of the declaration.

Based on this evidence, the trial court could have found Appellant's statements on the 911 tape were the result of reflective thought and did not constitute an excited utterance. The trial court did not abuse its discretion in refusing to admit the 911 tape as an exception to the hearsay rule. Appellant's Point I is denied.

*Point II—Exclusion of the*
*Reenactment Video*

During the State's direct examination of Detective Hyatt, the following exchange occurred:

Q. Can you describe to the jury what the purpose of having [the Evidence Technician Unit] come out to gather evidence?

A. They seize the evidence located at any scenes and take prints, pictures, photographs, everything.

Q. And what relevant things did you see in the apartment as to what happened that day?

A. It was kind of hard to tell. We did a scene reenactment video.

Outside of the hearing of the jury, the prosecutor stated that, despite being instructed not to, Hyatt had mentioned the scene reenactment video. Defense counsel requested to ask Hyatt additional questions regarding the scene reenactment video. The State protested, arguing that further questioning would make it clear that Appellant had made an exculpatory statement to police. The trial court denied Appellant's request to cross-examine

Hyatt on the video to avoid drawing any additional attention to the issue, finding the prosecutor had "glossed over it quickly enough" and it appeared Hyatt's reference was accidental. Appellant subsequently made an offer of proof of the scene reenactment video. On the video, Appellant stated that M.T. was unresponsive while still in bed, and was making a noise. Appellant stated that M.T. had a bowel movement while in bed so he took her to the bathroom where she fell forward and hit her head while he was washing her. Appellant stated that he tried to revive her and that before he called 911 he was not holding M.T.'s nose during CPR. In the video, Appellant demonstrated how he pushed on M.T.'s chest as instructed by the 911 dispatcher.

Appellant argues the trial court abused its discretion in excluding the video because the statements on the video were not offered for the truth of the matter asserted but to explain subsequent police conduct and to present a complete picture of the event, and because the State opened the door to its admission by presenting evidence of the video's existence.

Not all out-of-court statements are hearsay; the statement must be offered for the truth of the matter asserted to constitute hearsay. *Douglas*, 131 S.W.3d at 823. Hence, out-of-court statements offered not for the truth of the matter asserted, but instead to explain subsequent conduct, are not hearsay and are admissible assuming they are relevant. *Id.* at 824. "However, when such out-of-court statements go beyond what is necessary to explain subsequent police conduct, they are hearsay ... unless they qualify as non-hearsay on another basis." *Id.*

Appellant fails to elucidate how his self-serving exculpatory statements made in the video explain the subsequent police conduct or how the appearance of the

apartment or himself on the day of M.T.'s death was necessary to show a complete picture of the events. Based on the evidence, the reasonable conclusion is that the police investigation was influenced predominately by Q.G.'s statements to authorities and the fact that M.T. sustained serious, life-threatening injuries while in Appellant's care.

■ Despite Appellant's characterization, it is clear Appellant offered the video to prove the truth of the matter Appellant asserted therein, i.e., that M.T. woke up ill. The reenactment video was unnecessary to the jury's understanding of the case, and its admission offered nothing more than Appellant's hearsay version of events, which is inadmissible. The trial court did not abuse its discretion in finding that the reenactment video was inadmissible on this basis.

■ Nor was the detective's single accidental mention that a reenactment video had been made sufficient to open the door to the admission of the tape and Appellant's hearsay statements therein. The trial court found that the State glossed over the accidental remark and that any additional questioning on the issue would draw undue attention to the matter. The trial court's finding that the State did not open the door to admission of further evidence on the video was not error. Based on the foregoing, Appellant's Point II is denied.

### Point III—Evidence Regarding Prior Acts

During Ashley's testimony at trial, defense counsel requested a conference at the bench. Defense counsel stated that it anticipated that the State would ask Ashley about a prior occasion involving a burn on M.T.'s hand and objected on the basis of relevancy and hearsay. The State argued that the evidence was admissible to show motive, intent or lack of mistake.

The trial court ruled the evidence would be allowed.

Ashley went on to testify that she had left M.T. with Appellant on only one other occasion. On this occasion, Ashley had come home and discovered a burn on M.T.'s hand. Ashley testified that M.T. told her that Appellant had burned her hand. Ashley stated that after that point, M.T. always wanted to stay with Vickie.

Before Vickie testified, defense counsel objected to Vickie's anticipated testimony about the burn on M.T.'s hand, arguing it was improper character evidence. The trial court ruled that Vickie could testify as to changes in M.T.'s demeanor but not as to what M.T. told her about the burn. Defense counsel requested a mistrial based on Ashley's testimony, which was denied by the court. The court also denied defense counsel's request that portions of Ashley's testimony be excluded and that the jury be instructed not to consider this evidence.

■ Vickie then testified that shortly before Christmas 2007, M.T. had a burn on her hand that caused M.T.'s fingers to stick together. Vickie testified that after the burn appeared, M.T. did not want to go home and that she always wanted to stay with Vickie.

Appellant contends the evidence that Appellant burned M.T.'s hand with hot water before Christmas 2007 was inadmissible as evidence of uncharged crimes, namely assault or abuse of a child; did not tend to show motive, intent, absence of mistake or accident, common scheme or plan, or identity of the person charged; and was more prejudicial then probative.

■ In his motion for a new trial, Appellant raised the issue as to Ashley's testimony but did not assert any error with regard to the admission of Vickie's testimony. To preserve an evidentiary issue

for appellate review, the party must object upon introduction of the evidence and reassert the objection as error in the motion for new trial. *State v. Haslett*, 283 S.W.3d 769, 779 (Mo.App. S.D.2009). Therefore, Appellant has preserved his objection to Ashley's testimony but not that of Vickie.

### Ashley's Testimony

We review a trial court's refusal to grant a mistrial for an abuse of discretion. *State v. McGowan*, 184 S.W.3d 607, 610 (Mo.App. E.D.2006). The trial court is in a better position to observe the complained of incident and to determine the prejudicial effect, if any, the alleged error had on the jury. *Id.* "Granting a mistrial is a drastic remedy and should be exercised only in extraordinary circumstances where the prejudice to the defendant cannot be removed any other way." *State v. Albanese*, 9 S.W.3d 39, 51 (Mo. App. W.D.1999).

To be admissible, evidence must be both logically and legally relevant. *State v. Barriner*, 111 S.W.3d 396, 400–01 (Mo. banc 2003). Evidence is logically relevant when it has a legitimate tendency to directly establish the defendant's guilt of the charges and legally relevant when its probative value outweighs its prejudicial value. *State v. Blakey*, 203 S.W.3d 806, 811 (Mo.App. S.D.2006). "The balancing of the effect and value of evidence rests within the sound discretion of the trial court." *State v. Williams*, 865 S.W.2d 794, 801–02 (Mo.App. S.D.1993).

Generally, evidence of uncharged crimes is inadmissible unless it has a legitimate tendency to establish the defendant's guilt of the crime charged and is not merely used to show the defendant's bad character or predisposition to commit the crime. *State v. Henderson*, 826 S.W.2d 371, 374 (Mo.App. E.D.1992). Evidence of uncharged misconduct is admissi-

ble when it tends to establish motive, intent, absence of mistake or accident, a common scheme or plan, or the identity of the defendant. *State v. Mabry*, 285 S.W.3d 780, 785 (Mo.App. E.D.2009).

Here, the evidence that Appellant injured M.T. in the recent past was admissible to show Appellant's intent to cause serious physical injury or inflict cruel and inhuman punishment on M.T. See *State v. Candela*, 929 S.W.2d 852, 871 (Mo. App. E.D.1996) (admission of prior misconduct of the defendant toward the victim is admissible as evidence of motive, intent, or absence of mistake or accident). Further, Ashley's testimony was limited and its probative value as to intent outweighed any alleged prejudicial effect. The trial court did not abuse its discretion in overruling Appellant's objection to this evidence and in refusing to grant a mistrial after its admission.

### Vickie's Testimony

Appellant's objection to Vickie's testimony is subject to, at most, plain error review. Rule 30.20; *Johnson*, 220 S.W.3d at 385.

Vickie's trial testimony did not link the burn on M.T.'s hand to Appellant. Vickie testified only that she saw a burn on M.T.'s hand and that following M.T.'s being burned, M.T. did not want to go home and wanted to stay with Vickie. With regard to the admission of Vickie's testimony, Appellant has failed to present a claim that, on its face, establishes that an error has been committed or that such error presents substantial grounds to find that a manifest injustice or miscarriage of justice has resulted. Therefore, we decline to exercise plain error review. See *State v. Nibarger*, 304 S.W.3d 199, 201 (Mo.App. W.D.2009).

Based on the foregoing, Appellant's Point III is denied.

### Point IV—Dr. Gerard's testimony

In his fourth point, Appellant argues the trial court abused its discretion in permitting Dr. Gerard to testify that injuries on M.T. were consistent with child abuse because this testimony was beyond Dr. Gerard's expertise and invaded the province of the jury on the ultimate issue of Appellant's guilt. We disagree.

"[E]xpert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence." *Haslett,* 283 S.W.3d at 779 (internal citations omitted). An expert may testify as to his opinion on an ultimate issue in the case so long as the testimony aids the jury but does not invade the jury's province. *Id.* Invading the province of the jury includes stating that the defendant is guilty of the crimes. *Id.*

"In order to qualify as an expert, a witness must have knowledge or skill from education or experience that will aid the trier of fact." *Blakey,* 203 S.W.3d at 816. The extent of an expert's experience or training goes to the weight, not the admissibility, of the testimony. *Id.* The admission of expert testimony is within the sound discretion of the trial court. *Haslett,* 283 S.W.3d at 779–80.

At trial, Appellant frequently insinuated that M.T.'s numerous external injuries were the result of normal childhood accidents and falls. Dr. Gerard testified that M.T.'s injuries were not consistent with a minor fall, hitting her head on something, or playing with dogs. Dr. Gerard stated that it was very unlikely that M.T. could have sustained all of these injuries, meaning multiple areas of abrasion and bruising on different planes, in one fall. Dr. Gerard also testified that he would "absolutely consider [M.T.'s injuries to be] consistent with abusive behavior or suspicion of abusive type of injures."

Appellant argues that Dr. Gerard was not qualified as an expert in the area of child abuse and his opinion was outside the scope of his expertise. Dr. Gerard testified he is certified in pediatric emergency medicine and has been practicing at Cardinal Glennon Children's Medical Center for 19 years. In light of Dr. Gerard's extensive training and experience in treating children, he was qualified to testify as to his observations regarding M.T.'s injuries. Also, as the treating physician, Dr. Gerard was in the position to assess M.T.'s injuries firsthand.

Further, it cannot be said that Dr. Gerard's testimony invaded the province of the jury. Dr. Gerard did not testify, nor could it be inferred from his testimony, that it was Appellant who caused M.T.'s injuries. Dr. Gerard never opined as to Appellant's guilt. Dr. Gerard's testimony that M.T.'s injuries were consistent with abusive behavior was admissible expert testimony that did not invade the province of the jury. The jury was free to weigh Dr. Gerard's opinion and assess it in light of the other evidence presented at trial. The trial court did not err in allowing Dr. Gerard's testimony on this issue. Appellant's Point IV is denied.

### Point V—Dr. Young's testimony

In his fifth point on appeal, Appellant argues the trial court abused its discretion in excluding Dr. Young's testimony that (1) M.T.'s liver lacerations were caused by improper CPR performed by Appellant prior to getting correct instructions from the 911 dispatcher; (2) the cause of death was undetermined because Dr. Young knew that M.T. went into cardiac arrest and the liver laceration did not produce

enough blood to cause her death; (3) without more information, he could not tell what the actual cause of death was because he did not have enough heart tissue with which to decide what caused her heart to stop; and (4) M.T.'s postmortem injuries would have been from a fall in the bathroom after she went into cardiac arrest and any splashing of water could have deluded the postmortem appearance of her facial injuries. Appellant argues the court erred in excluding this evidence because Dr. Young's testimony would not have been solely based on Appellant's hearsay statements but also on the statements by emergency personnel in the police reports, and the State opened the door to this testimony by asking Dr. Young on cross-examination what the cause of death was and why it was undetermined.

Contrary to Appellant's assertions, Dr. Young did, in fact, testify as to the great majority of this information. Dr. Young testified that (1) M.T.'s liver lacerations were caused by CPR and that the administration of improper CPR, through incorrect hand placement and frantic compressions, can cause liver lacerations; (2) the liver lacerations did not cause M.T.'s death, and the amount of blood in M.T.'s abdomen was insufficient to cause shock and indicates that M.T.'s heart stopped before the liver was lacerated; (3) the cause of death was undetermined and he needed additional slides of heart tissue, which were unavailable, in order to determine what caused M.T.'s heart to stop; and (4) almost all of M.T.'s external injuries were postmortem and if a child went into cardiac arrest while in a bathtub, the running or splashing of hot water could cause a postmortem injury.

It appears that Dr. Young was only precluded from testifying to a few specific details of his conclusions, i.e., that some of M.T.'s injuries could have been from hitting her face and forehead on the bathtub faucet, while he was still allowed to testify to and explain many of his opinions and conclusions. These very few minor details were completely dependent on Appellant's hearsay account of the events to police and emergency personnel. To allow Dr. Young to testify to these additional minute details would amount to little more than a backdoor entry of Appellant's hearsay statements without the imposition of testifying and cross-examination. Dr. Young was able to testify at great length about his conclusions based upon his review of the evidence, and was only precluded from serving as a conduit for Appellant's hearsay statements or his opinions based solely upon those statements. The trial court did not abuse its discretion in limiting Dr. Young's testimony in such a fashion.

In the alternative, Appellant contends the State opened the door to this testimony through its cross-examination by asking Dr. Young about what killed M.T. and whether it was possible for improper CPR to have caused M.T.'s death. However, on direct examination, Dr. Young testified that, contrary to the medical examiner's opinion, he believed that the liver lacerations did not cause M.T.'s death and M.T.'s heart had stopped before her liver was lacerated by CPR. Quite simply, the State's cross-examination opened no new doors. The State's questions only allowed Dr. Young to further explain his conclusions as to M.T.'s cause of death. Dr. Young did so by explaining that M.T.'s heart stopped but her cause of death was undetermined because no additional heart slides were available.

The trial court did not abuse its discretion in finding that the State's cross-examination did not open the door for the defense to admit Dr. Young's opinion testimony based solely on Appellant's hear-

say statements to police. Based on the foregoing, Appellant's Point V is denied.

### Point VI—Double Jeopardy

In his final point, Appellant argues the trial court erred in denying his motion for judgment of acquittal at the close of the evidence and in entering judgment and sentence against him for conventional second-degree murder and abuse of a child resulting in death because his convictions and sentences for both offenses constitute multiple punishments for the same offense, in that striking M.T. constituted a single, indivisible continuous transaction, so that no distinct or separate act upon which to predicate abuse of a child resulting in death exists.

Normally, claims of double jeopardy violations are questions of law that this Court reviews *de novo*. *State v. Barraza*, 238 S.W.3d 187, 193 (Mo.App. W.D.2007). However, Appellant did not preserve this issue for appellate review by failing to include this issue in his motion for a new trial. Appellant argued in his new trial motion that the court erred in overruling his motion for judgment of acquittal at the close of all the evidence because the State failed to present evidence of each offense's elements, specifically evidence of deliberation. This is not the same as an objection to the convictions based on a double jeopardy violation. Appellant's claim is subject to plain error review only.

Both the United States and the Missouri Constitutions provide protections against double jeopardy. *State v. Johnson*, 245 S.W.3d 288, 293 (Mo.App. W.D. 2008). Article I, section 19 of the Missouri Constitution, however, applies only to re-trial after acquittal. *Id.* Because Appellant's case does not concern a retrial after acquittal, the Missouri Constitution does not afford him any protection against double jeopardy.

The Fifth Amendment to the United States Constitution, however, provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This protection is applicable to the states through incorporation into the Due Process Clause of the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). "The Fifth Amendment's Double Jeopardy Clause protects a defendant from not only successive prosecutions for the same offense after acquittal or conviction but also from multiple punishments for the same offense." *Johnson*, 245 S.W.3d at 293.

With regard to multiple punishments, the inquiry is limited to determining whether cumulative punishments were intended by the legislature. *Johnson*, 245 S.W.3d at 293. "When the legislature specifically authorizes cumulative punishments under two statutes that proscribe the same conduct, cumulative punishment may be imposed against the defendant without violating the Double Jeopardy Clause." *Id.* Multiple punishments are allowed when the defendant has "in law and fact committed separate crimes." *Barraza*, 238 S.W.3d at 193. "The court looks to the allowable 'unit of prosecution' by the charging statute to determine whether the legislature intended multiple punishments." *Id.*

Appellant was convicted of conventional second-degree murder, which required the State to prove that Appellant knowingly caused the death of another person or, with the purpose of causing serious physical injury to another person, caused the death of another person. Section 565.021.1(1). Appellant was also convicted of abuse of a child resulting in death, which provides that:

1. A person commits the crime of abuse of a child if such person:

(1) knowingly inflicts cruel and inhuman punishment upon a child less than seventeen years old . . .

3. Abuse of a child is a class C felony, unless: . . .

(2) A child dies as a result of injuries sustained from conduct chargeable pursuant to the provisions of this section, in which case the crime is a class A felony.

Section 568.060.

■ " '[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of an additional fact which the other does not.' " *Yates v. State*, 158 S.W.3d 798, 802 (Mo.App. E.D. 2005), quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

■ Appellant's conviction of conventional second-degree murder required proof that Appellant knowingly caused M.T.'s death or, with the purpose of causing serious physical injury, caused M.T.'s death. Abuse of a child, however, requires proof that Appellant knowingly inflicted cruel and inhuman punishment upon a child less than 17 years old. Under the *Blockburger* test, each of these offenses has an element that the other does not and, thus, constitute separate offenses.

Appellant also argues his convictions and sentences cannot stand because Section 556.041(4) prohibits convictions for offenses constituting a continuing course of conduct and that the striking of M.T. constituted a single, indivisible transaction. In Section 556.041, the legislature provides that:

When the same conduct of a person may establish the commission of more than one offense he may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if: . . .

(4) The offense is defined as a continuing course of conduct and the person's course of conduct was uninterrupted, unless the law provides that specific periods of such conduct constitute separate offenses.

Section 556.041.

In this case, neither offense is nor was presented as a continuing course of conduct. The act of striking someone is distinguishable from those offenses that intrinsically involve a continuing course of conduct such as false imprisonment, bigamy, and operating a house of prostitution. See *Yates*, 158 S.W.3d at 802. Because the acts constituting the offenses were not a continuing course of conduct, Section 556.041 does not prohibit Appellant's conviction for each offense based on the same conduct.

■ Appellant further contends that his conviction for both offenses constitutes a "piecemeal" prosecution through the inappropriate "splitting" of a single crime into separate parts. Appellant argues that both convictions cannot stand pursuant to "the merger doctrine" and the interplay between Sections 556.041(4) and 565.021.2.

"The merger doctrine, initially a judicial creation, is 'a means of limiting or barring application of the felony-murder rule' where the underlying felony is the very act that caused the homicide." *State v. Bouser*, 17 S.W.3d 130, 135 (Mo.App. W.D. 1999). First adopted in Missouri in *State v. Shock*, 68 Mo. 552, 561–62 (1878), the *Shock* Court held that the felony-murder statute in effect at the time did not include "those acts of personal violence to the deceased which are necessary and constituent elements of the homicide itself, and are, therefore, merged in it." *Shock*, 68 Mo. at 561; *Bouser*, 17 S.W.3d at 135.

As noted, Section 556.041(4) limits the prosecution for multiple offenses when the

offense is defined as a continuing course of conduct and the person's course of conduct was uninterrupted. Section 565.021 is the second-degree murder statute, which defines both conventional second-degree murder and felony murder. Subsection 565.021.2 states that "the punishment for second degree murder shall be in addition to the punishment for commission of a related felony or attempted felony, other than murder or manslaughter."

Having found that Section 556.041(4) does not prohibit Appellant's conviction of both offenses, we turn to Appellant's contention that the merger doctrine and Section 565.021.2 prohibit convictions for both conventional second-degree murder and abuse of a child resulting in death. Neither provides any support to Appellant's proposition that he cannot be convicted of both offenses. Initially, we note that modern precedent suggests that the merger doctrine has been abrogated. See *State v. Williams*, 24 S.W.3d 101, 117 (Mo.App. W.D.2000) (regardless of the court's belief as to the merits of the merger doctrine, the court is obligated to enforce the felony murder statute as written and the legislature excluded only murder and manslaughter as predicate felonies for felony murder); *State v. Coody*, 867 S.W.2d 661, 665–66 (Mo.App. S.D.1993) (merger principles no longer have a place in double jeopardy analysis); *State v. Dudley*, 303 S.W.3d 203, 207 (Mo.App. W.D. 2010) (merger doctrine is no longer a viable theory under the Missouri statutory scheme).

Assuming *arguendo* that the merger doctrine is still viable, it is not applicable to the case *sub judice*. The merger doctrine only applies to convictions for felony murder, not conventional second-degree murder. The rationale for the merger doctrine is based upon the recognition that the felony murder rule relieves prosecutors of the burden of proving the requisite

intent for murder and that, as a practical matter, the vast majority of homicides involve some type of felonious assault. *Williams*, 24 S.W.3d at 113. The merger doctrine was intended to ensure that the felony murder rule was applied as intended, to deter negligent or accidental killings that occur in the course of committing a felony, and not as a way to eliminate the *mens rea* requirement for most homicide cases. *Id.* at 113–14. Conventional second-degree murder has a *mens rea* requirement; thus, the rationale for limiting the application of the felony murder rule by the merger doctrine simply does not apply to conventional second-degree murder. Similarly, Section 565.021.2 has traditionally only been applied to convictions for felony murder and not to convictions for conventional second-degree murder. See *Bouser*, 17 S.W.3d at 140.

We conclude that no double jeopardy violation occurred in convicting Appellant of both conventional second-degree murder and abuse of a child resulting in death. The trial court did not plainly err in entering judgments of conviction and sentence against Appellant for both offenses. Based on the foregoing, Appellant's Point VI is denied.

## Conclusion

The judgment of the trial court is affirmed.

CLIFFORD H. AHRENS, J., and LAWRENCE E. MOONEY, J., concur.